**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA ex rel.
Thornton G. Sanders,

        *Plaintiff-Appellant,*

        v.

NORTH AMERICAN BUS INDUSTRIES,
INCORPORATED; DELOITTE
& TOUCHE USA, LLP; NORTH
AMERICAN BUS INDUSTRIES KFT.,

        *Defendants-Appellees,*

        and

NORTH AMERICAN BUS INDUSTRIES,
RT.; AMERICAN IKARUS; PETER Z.
RONA; THE FIRST HUNGARY FUND,

        *Defendants.*

⎫
⎬ No. 07-1773
⎭

TAXPAYERS AGAINST FRAUD
EDUCATION FUND,

        *Amicus Supporting Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:02-cv-03084-JFM)

Argued: September 24, 2008

Decided: November 5, 2008

Before WILKINSON, Circuit Judge, HAMILTON, Senior Circuit Judge, and James C. CACHERIS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Senior Judge Hamilton and Senior Judge Cacheris joined.

---

## COUNSEL

**ARGUED**: Joseph A. Black, CULLEN LAW FIRM, P.L.L.C., Washington, D.C., for Appellant. James Patrick Ulwick, KRAMON & GRAHAM, Baltimore, Maryland; Amelia Toy Rudolph, SUTHERLAND, ASBILL & BRENNAN, Atlanta, Georgia, for Appellees. **ON BRIEF:** Daniel E. Cohen, CULLEN LAW FIRM, P.L.L.C., Washington, D.C., for Appellant. Melissa H. Maxman, BAKER & HOSTETLER, L.L.P., Washington, D.C., for Appellees North American Bus Industries, Incorporated and North American Bus Industries, Kft. Mike Bothwell, Sara Vann, BOTHWELL & HARRIS, P.C., Roswell, Georgia; James W. Moorman, Joseph E. B. White, TAXPAYERS AGAINST FRAUD EDUCATION FUND, Washington, D.C., for Amicus Supporting Appellant.

---

## OPINION

WILKINSON, Circuit Judge:

This appeal arises from a *qui tam* action under the False Claims Act brought by Thornton G. Sanders against his former employer, North American Bus Industries, Inc.

("NABI"). Sanders alleges that NABI defrauded the United States by underpaying duties on bus frames that NABI imported from Hungary and by falsely certifying that the buses that NABI manufactured using those frames were eligible for federal "Buy America" subsidies. Sanders also alleges that Deloitte & Touche USA, LLP, participated in NABI's fraud.

The district court rejected all of Sanders's claims on various grounds. Sanders now challenges each of those dismissals, asserting myriad defects of both fact and law. We agree, however, with the district court that plaintiff has failed to establish the necessary elements of an FCA claim. We thus affirm the judgment.

I.

A.

NABI is an Alabama corporation that manufactures and sells transit buses. The manufacturing process occurs in stages. First, the bus frames, or "shells," are constructed by NABI's corporate parent, North American Bus Industries, Kft. ("NABI Hungary"). NABI Hungary then ships the shells to NABI's headquarters in Alabama. The shipments include a number of components, like the wheels, some of which are fixed permanently to the shells prior to shipment. NABI then completes the assembly, using both the shipped components and additional American-made parts.

NABI distributes the completed buses to municipalities and transit authorities throughout the United States. The federal government subsidizes these local entities for purchases of buses that meet federal "Buy America" requirements. *See* 49 U.S.C. § 5323(j); 49 C.F.R. §§ 661.1-.21. Local entities receiving subsidies require NABI to certify that its buses satisfy the Buy America provisions. In particular, NABI must

certify that more than sixty percent of the components in its completed buses (by cost) are produced in the United States.

The bus shells and components that NABI imports from its Hungarian parent are taxed according to the Harmonized Tariff Schedule of the United States ("HTSUS"), which provides the various classifications and corresponding rates of duty for imported merchandise. *See* 19 U.S.C. § 1202. Prior to June 1998, NABI's bus shells were classified under the HTSUS subheading for "Bodies (including cabs), for . . . motor vehicles." HTSUS subheading 8707.90.50. That classification carried a duty of four percent of the value of the imported bus shells and components.

In June 1998, NABI hired Damon Pike, a director at Deloitte, to file a protest on NABI's behalf with the U.S. Customs Service (currently U.S. Customs and Border Protection). *See* 19 U.S.C. § 1514 (Customs protests); 19 C.F.R. pt. 174. NABI sought to have its previous imports reclassified under the HTSUS subheading for "Motor vehicles [with a diesel engine] . . . [d]esigned for the transport of 16 or more persons, including the driver." HTSUS subheading 8702.10.30. In other words, NABI sought to have the imports that previously had been classified as mere bodies of buses reclassified under the subheading for completed motor vehicles. Under the latter classification, NABI's imports would have been eligible for duty-free treatment under the Generalized System of Preferences because the imports were from Hungary. *See* 19 U.S.C. §§ 2461-2467.

NABI's protest relied primarily on General Rule of Interpretation 2(a) of the HTSUS. Rule 2(a) provides that "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article."

Based on that rule, NABI argued that its bus shells should be reclassified because they had the "essential character" of

finished motor vehicles. NABI supported that argument by listing twenty components that it asserted were "permanently installed" on the bus shells at the time of importation. NABI's protest did concede that, when compared with the imports in a prior Customs ruling on trolley bus shells, NABI's imported components were somewhat fewer and had a somewhat lesser value. NABI's protest further expressly listed twelve components that NABI acknowledged were installed only after importation. But NABI argued that those differences and missing parts did not alter the "essential character" of NABI's imports.

In November 1998, Customs issued a decision granting NABI's protest and holding that NABI's imports should have been classified under subheading 8702.10.30 as "motor vehicles" eligible for duty-free treatment. The decision cited the components listed in NABI's protest and noted that the remaining components were installed after importation. Customs then stated its finding that "[t]he bus shells when imported contain a substantial amount of equipment and number of components necessary for a completed transit bus." Customs concluded that NABI's imports, even in their "unfinished state," had the "essential character" of motor vehicles.

Based on the successful protest decision, NABI received refunds of duties that it had paid on bus shells imported between April and August 1997; statutory deadlines prevented NABI from seeking refunds for earlier imports. Apparently based in part on the advice of Damon Pike of Deloitte, NABI also began classifying its subsequent imports under the duty-free subheading for motor vehicles.

B.

Thornton G. Sanders, the *qui tam* relator in this action, is a former executive of NABI. NABI hired Sanders as Vice

President and Chief Financial Officer in 1993. In 1994, Sanders became President and Director of NABI.[1]

During his employment at NABI, Sanders raised questions within the company about certain contracts between NABI and NABI Hungary. NABI and its parent company entered into two separate contracts for each set of bus shells that NABI imported in the years from 1993 to 1997. Under the first contract, NABI paid NABI Hungary for the bus shells and their components. Under the second contract, NABI paid NABI Hungary for engineering and technology services. NABI characterized those services as consisting of both tangible designs and intangible technical information that assisted NABI in assembling the imported shells and parts. Because NABI did not consider the engineering and technology services to be part of the value of the imported bus shells, NABI did not include the cost of those services when declaring the value of the shells to Customs, or when calculating the eligibility of its buses for Buy America subsidies.

In 1996, Sanders sent memoranda to others at NABI recommending that NABI discontinue its separate payments for engineering and technology services. Sanders asserted that the company's payments did not accurately reflect the technical assistance that NABI was receiving from NABI Hungary. Apparently acting on Sanders's recommendation, NABI discontinued its separate contracts for engineering and technology services in 1997.

NABI also terminated Sanders's employment in 1997, shortly after Sanders proposed that the company be sold to a group of investors that included himself and NABI's other senior managers. Sanders subsequently wrote a letter to another NABI employee stating that he had been fired

---

[1]At that time, NABI was known as American Ikarus, Inc. Any distinctions between NABI and its predecessor corporation are immaterial to this case.

because executives at NABI Hungary viewed Sanders's proposed purchase of the company as an act of disloyalty.

C.

Sanders subsequently filed suit against NABI in 2002 under the *qui tam* provisions of the False Claims Act ("FCA"). 31 U.S.C. §§ 3729-3733. Section 3729 of the FCA creates liability in the form of treble damages and civil penalties of up to $10,000 for persons who make false or fraudulent claims for payment to the United States. *Id.* § 3729(a). And Section 3730 provides that civil actions under the FCA may be brought either by the Attorney General, *id.* § 3730(a), or by private persons, known as relators, who sue on the federal government's behalf, *id.* § 3730(b). A relator may recover up to thirty percent of the proceeds of a successful action, plus attorney's fees and costs. *Id.* § 3730(d). The relator must file his complaint under seal and notify the government of his action, and the government may then elect either to intervene in the suit or to allow the relator to continue the suit alone. *Id.* § 3730(b). The United States has consistently declined to intervene in Sanders's action.

Sanders stated five causes of action under the FCA. In Count I, Sanders claimed that NABI had falsely certified that its buses were eligible for Buy America subsidies. The district court granted summary judgment to NABI on Count I because Sanders's claims were barred by the FCA's six-year statute of limitations in 31 U.S.C. § 3731(b)(1) and because the United States had not suffered actual damages.

In Counts II and III, Sanders claimed that the protest submitted to Customs by NABI and Deloitte in 1998 contained a false description of NABI's imported bus shells. The district court granted Deloitte's motion to dismiss both counts as time-barred. The district court also granted summary judgment to NABI on Counts II and III. The court held that any

alleged false statements in NABI's protest were immaterial to Customs' decision to reclassify NABI's imports.

In Count IV, Sanders claimed that NABI had also underpaid its duties by failing to declare to Customs the value of the separate payments that NABI made for engineering and technology services. The district court granted summary judgment to NABI, holding that the successful Customs decision made clear that NABI never owed any duties on its imports. Thus, even if NABI had failed to declare the imports' full value, the court held that NABI had not violated the FCA because NABI had not deprived the government of any money that it was actually due.

Finally, Sanders claimed in Count V that he had been wrongfully discharged in violation of the FCA's anti-retaliation provision. 31 U.S.C. § 3730(h). The district court dismissed Sanders's claim as time-barred under the Supreme Court's decision in *Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 545 U.S. 409 (2005). Sanders did not oppose that dismissal.

Sanders now appeals the district court's disposition of each of his claims. We discuss those claims in turn.

## II.

Sanders first contends that the district court misconstrued the FCA's statute of limitations, 31 U.S.C. § 3731(b), which provides the following:

> A civil action under section 3730 may not be brought—
>
> (1) more than 6 years after the date on which the violation of section 3729 is committed, or
>
> (2) more than 3 years after the date when facts material to the right of action are known or reasonably

should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

The district court held that the six-year limitations period in Section 3731(b)(1) barred Sanders's claims against NABI in Count I and against Deloitte in Counts II and III. Sanders argues that the district court should have applied Section 3731(b)(2) to extend the limitations period for those claims. Sanders interprets Section 3731(b)(2) to allow a relator to bring a cause of action within ten years of an FCA violation, as long as the relevant government official has not had actual or constructive knowledge of the violation for more than three years. We hold that Section 3731(b)(2) extends the FCA's statute of limitations beyond six years only in cases in which the United States is a party.

It would be problematic to read the text of the statute any other way. Section 3731(b)(2) refers only to the United States —and not to relators. Thus, Congress intended Section 3731(b)(2) to extend the FCA's default six-year period only in cases in which the government is a party, rather than to produce the bizarre scenario in which the limitations period in a relator's action depends on the knowledge of a nonparty to the action.

The specific language in the statute bears this out. The limitations period in Section 3731(b)(2) starts when the government knows or should know of "facts material to the right of action." This language makes perfect sense when referring to an action brought by the government: the limitations period is based on the government's knowledge of "facts material to the right of action" because that particular knowledge notifies the government that it has an actionable FCA claim. But applying the statute's language to a relator's action makes no

sense whatsoever. The government's knowledge of "facts material to the right of action" does not notify the relator of anything, so that knowledge cannot reasonably begin the limitations period for a relator's claims. Furthermore, once the material facts supporting a right of action are known to the United States, it is doubtful that the government official "charged with responsibility to act in the circumstances" could be charged with any responsibility other than to see that the government brings or joins an FCA action within the limitations period. After all, government officials are certainly not "charged with responsibility" to ensure that a relator brings a timely FCA action. All of these textual elements demonstrate that Section 3731(b)(2) makes sense only when read to extend the FCA's limitations period in actions brought or joined by the United States.

Our reading of the statute's text finds support in the fact that Section 3731(b)(2) is almost identical to another federal statute, 28 U.S.C. § 2416(c). Section 2416(c) tolls the generally applicable statute of limitations in actions brought by the United States—and only by the United States—until "facts material to the right of action" are actually or constructively known by an "official of the United States charged with the responsibility to act in the circumstances." Section 2416 was enacted in 1966. *See* Pub. L. No. 89-505, § 1, 80 Stat. 304, 305 (1966). Congress added Section 3731(b)(2) to the FCA in 1986 (the FCA previously had a uniform six-year limitations period). *See* Pub. L. No. 99-562, § 5, 100 Stat. 3153, 3158 (1986). Thus, it appears that when enacting Section 3731(b)(2), Congress adopted the language from Section 2416(c) that applies only to actions brought by the government. This apparent transcription of statutory language supports the conclusion that the text of Section 3731(b)(2) lengthens the FCA's limitations period only when the government is a party. *See United States ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 724-25 (10th Cir. 2006).

Sanders proffers a contrary reading of the statute's text. Sanders argues that Section 3731(b)(2)'s failure to mention relators actually supports the application of that section to *qui tam* actions. He contends that the phrase "[a] civil action under section 3730" in the preface to Section 3731(b) includes all civil actions under the FCA; he then argues that Section 3731(b)(2) does not contain any language expressly excluding relator actions; and he therefore concludes that relator actions fall within the scope of Section 3731(b)(2).

Sanders's argument fails for two reasons. First, Section 3731(b)(2) does contain language excluding actions by relators because the statutory language makes no sense when applied to an action in which the government is not a party. Second, we also disagree with Sanders's other premise, that "[a] civil action" must be read indiscriminately to encompass all FCA claims in all contexts. In fact, the Supreme Court recently rejected almost exactly the same argument in *Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 545 U.S. 409 (2005). In *Wilson*, the Supreme Court held that Section 3731(b)'s reference to civil actions under Section 3730 did not include anti-retaliation claims, even though FCA anti-retaliation claims are brought under Section 3730(h). 545 U.S. at 411. The Court recognized that "Congress used the term 'action under section 3730' imprecisely in § 3731 and, in particular, that Congress sometimes used the term to refer only to a subset of § 3730 actions." *Id.* at 418. And the Court reasoned that when "a civil action" was read in context, Section 3731(b)(1)'s reference to a "violation of section 3729" suggested that the statute did not include anti-retaliation claims because a violation of Section 3729 was not an element of those claims. *See* 545 U.S. at 415-16. The same reasoning applies here. When the phrase "a civil action" is read in context, Section 3731(b)(2)'s restrictive language referring to the United States—and not to relators—makes clear that only a subset of civil actions may benefit from the extended limitations period in Section 3731(b)(2)—those in which the government is a party.

Sanders's proposed construction of the statute also generates numerous practical difficulties. Under Sanders's reading, the statute of limitations in *qui tam* actions would depend on the knowledge of a nonparty government official. Not only is that result counterintuitive, but it would also cause innumerable headaches for both defendants and the government during discovery. To advance a statute of limitations defense, defendants would be forced to seek out and litigate the identity and knowledge of a government official not a party to the action. And government agencies would be subjected to disruption and expense in responding to discovery requests in actions in which the government affirmatively chose to avoid those concerns by declining to intervene. We are reluctant to place these burdens on FCA defendants and the government absent a clear textual basis for doing so.

Sanders's reading of Section 3731(b)(2) also would allow relators to sit on their claims for up to ten years before filing an action and informing the government of the material facts. Indeed, relators would have a strong financial incentive to allow false claims to build up over time before they filed, thereby increasing their own potential recovery. By empowering relators to extend the limitations period at will, Sanders's reading would render the six-year limitations period in Section 3731(b)(1) superfluous in nearly all FCA cases, thereby contradicting "our duty to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotations omitted); *see Sikkenga*, 472 F.3d at 725-26 (agreeing that the approach advocated by Sanders would render Section 3731(b)(1) superfluous).

Moreover, allowing relators to sit on their claims would undermine the purpose of the *qui tam* provisions of the FCA: to combat fraud quickly and efficiently by encouraging relators to bring actions that the government cannot or will not—"to stimulate actions by private parties should the prosecuting officers be tardy in bringing the suits." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 547 (1943); *Sikkenga*, 472

F.3d at 725. Sanders's interpretation would instead allow fraud to continue unabated for up to ten years. And a relator's failure to notify the government promptly of FCA violations might also cause the government to lose out on its ability to bring a criminal fraud prosecution, which must be filed within five years of the violation. *See* 18 U.S.C. §§ 287, 3282; *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1218 (9th Cir. 1996).

This issue has admittedly given rise to different approaches in the federal courts. Our interpretation of Section 3731(b) is decidedly the majority approach in the federal courts of appeals, where no circuit court has accepted Sanders's view that Section 3731(b)(2) extends the limitations period in *qui tam* actions regardless of how long the relator has known of the material facts. The Tenth Circuit has expressly held that Section 3731(b)(2) does not apply to *qui tam* suits in which the government has not intervened. *Sikkenga*, 472 F.3d at 725; *see also United States ex rel. Erskine v. Baker*, No. 99-50034, 2000 WL 554644, at *1 (5th Cir. Apr. 13, 2000) (same); *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 515, 519-20 (6th Cir. 2007) (applying six-year limitations period to a relator's claims); *Foster v. Savannah Commc'n*, No. 04-10876, 140 Fed. Appx. 905, 907-08 (11th Cir. July 25, 2005) (same). *But see Hyatt*, 91 F.3d 1211, 1214-18 (9th Cir. 1996) (holding that Section 3731(b)(2) applies when the government is not a party but that the relator is the "official of the United States" on whose knowledge the limitations period depends); *United States ex rel. Malloy v. Telephonics Corp.*, No. 01-3916, 68 Fed. Appx. 270, 272-73 (3d Cir. Apr. 16, 2003) (also interpreting Section 3731(b)(2) to depend on the relator's knowledge).[2]

---

[2]Because we hold that Sanders cannot seek the benefit of Section 3731(b)(2), we need not and do not decide which specific government official is "charged with responsibility to act in the circumstances"—a question that has perplexed some courts. *Compare United States v. Macomb Contracting Corp.*, 763 F. Supp. 272, 274 (M.D. Tenn. 1990) (relevant official must be within the Department of Justice) *with United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1009-10 (N.D. Ill. 2001) (knowledge of other government officials may be imputed to DOJ).

The majority of district courts in circuits other than these are also in accord with our interpretation. *See United States ex rel. Fisher v. Network Software Assocs., Inc.*, 180 F. Supp. 2d 192, 194 (D.D.C. 2002); *United States ex rel. El Amin v. George Washington Univ.*, 26 F. Supp. 2d 162, 172-73 (D.D.C. 1998); *United States ex rel. Finney v. Nextwave Telecom, Inc.*, 337 B.R. 479, 486 (S.D.N.Y. 2006); *United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 6 F. Supp. 2d 263, 265 (S.D.N.Y. 1998); *United States ex rel. Vosika v. Starkey Labs., Inc.*, No. Civ. 01-709, 2004 WL 2065127, at *2-3 (D. Minn. Sept. 8, 2004). A minority, however, has adopted Sanders's view. *See United States ex rel. Pogue v. Diabetes Treatment Ctrs. of America*, 474 F. Supp. 2d 75, 81-89 (D.D.C. 2007); *United States ex rel. Salmeron v. Enterprise Recovery Sys., Inc.*, 464 F. Supp. 2d 766, 769-70 (N.D. Ill. 2006); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 777 F. Supp. 195, 204-05 (N.D.N.Y. 1991).

Based on our interpretation of Section 3731(b), we affirm the district court's grant of summary judgment on Count I to NABI. Before the district court, Sanders limited the scope of Count I solely to claims that arose outside of the six-year limitations period. We therefore need not reach the question of whether the government suffered actual damages from the Buy America fraud that Sanders alleged in Count I. We also affirm the district court's dismissal of Counts II and III against Deloitte as time-barred.[3]

---

[3]Sanders tries to circumvent the district court's holding that his claims against Deloitte under Count III were untimely. Even though all of Deloitte's alleged misconduct occurred outside of six years, Sanders contends that Deloitte caused subsequent violations by NABI within the limitations period. But that was not the theory of liability expressed in Count III of Sanders's complaint, which did not allege any independent FCA violations other than the supposedly false Customs protest. *See Second Amended Complaint* ¶ 40. Count III as pleaded against Deloitte was therefore time-barred. And even if we were to construe Count III to contemplate additional, independent FCA violations, Sanders's complaint warranted dis-

III.

Sanders contends that the district court erred when it granted summary judgment to NABI on Counts II and III of Sanders's complaint. In those counts, Sanders claimed that NABI violated the FCA because the protest that NABI submitted to Customs in 1998 misrepresented the condition of the company's bus shells when they were imported, thereby improperly allowing NABI to obtain duty-free treatment for its imports. The district court held that Sanders failed to establish that the alleged false statements made by NABI in its protest were material to Customs' decision to reclassify NABI's imports.

The elements of an FCA claim are straightforward. "[T]he plaintiff must prove: (1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or conduct caused the government to pay out money or to forfeit money due." *Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003). The standard for materiality in the Fourth Circuit is also settled. "Under the FCA, a statement or course of conduct is material if it 'has a natural tendency to influence agency action or is capable of influencing agency action.'" *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008) (quoting *United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1460 (4th Cir. 1997)).

Sanders did not allege under Counts II and III that NABI made any false statement outside of the protest that it submit-

missal for other reasons. For one, Sanders failed to adequately plead the element of causation because Deloitte's alleged advice to NABI to enter its bus shells duty-free was superfluous to the Customs decision itself. Furthermore, Sanders failed to allege any FCA violations within the statutory period with the particularity required by Federal Rule of Civil Procedure 9(b).

ted to Customs. *Second Amended Complaint* ¶¶ 37-41. We therefore analyze only the materiality of the protest's alleged misstatements. NABI argued that its bus shells should be reclassified because they had the "essential character" of finished motor vehicles. And to support that argument, the protest listed twenty components and stated that those components were "permanently installed" when the shells were imported.

Before the district court, Sanders claimed initially that the protest was materially false because some of the named components were not "*permanently* installed." *Second Amended Complaint* ¶ 24; *Opposition to Deloitte's Motion to Dismiss* at 18 ("The Amended Complaint also sets forth the factual basis for the falsity of the protest, i.e., that at least seven specific components were not permanently installed."). For example, Sanders contended that the protest was false because the axles imported with the bus shells had to be removed and subsequently reattached after importation. *Second Amended Complaint* ¶ 26.

Sanders's initial argument failed because the issue of permanent installation was clearly immaterial to Customs' classification of NABI's bus shells. Customs' decision in favor of NABI did not rely on a finding that any components were installed permanently. Instead, it relied solely on a finding that the bus shells "contain[ed] a substantial amount of equipment and number of components necessary for a completed transit bus." A previous Customs ruling (cited by NABI in its protest) also looked only to the presence of components, not to whether they were permanently installed. Sanders therefore eventually acknowledged in his summary judgment motion that permanent installation was immaterial: "For classification purposes, it does not matter if any of the components were permanently installed." *Sanders's Motion for Summary Judgment* at 14.

After conceding on the issue of permanent installation, Sanders nonetheless argues that NABI's protest was materi-

ally false because a few of the components listed in the protest were either themselves partially incomplete or were not actually imported with the bus shells. But even when the evidence in the record is viewed generously in Sanders's favor, it is clear that the protest at most contained minor deficiencies. The evidence shows that no more than one or two subcomponents of the suspension and power steering systems were not imported with the bus shells. Most, but not all, of the buses' wheels and tires were included. And some of NABI's bus shells (apparently beginning with the ones imported in the spring of 1998) did not include brake chambers and were imported with axles that were removed and sent back to Hungary. Sanders does not allege that any other components listed in NABI's protest were missing or incomplete, nor does the evidence in the record suggest that to be the case.

When the record evidence is properly characterized, the flaw in Sanders's claim is obvious. Assuming for purposes of argument that NABI's statements were false, Sanders has given us no reason to believe that when Customs considered a protest that listed twenty imported components,[4] those false statements regarding one or two missing components—much less subcomponents—were material to Customs' decision.[5]

Sanders has focused most of his energy on alleging falsity in the protest by diving into the minute details of the subcomponents of the bus shells. But as Sanders's claims of falsity

---

[4]Those components were: the base structure; body; axles; front suspension; rear suspension; rims; wheels; power steering; brake chamber; fuel tank; engine cradle; flooring; partial door system including the door panels; windshield; outside body trim; corrosion protection paint; steering wheel; tracking for interior lights; air duct system; and destination sign door and enclosure.

[5]The protest also acknowledged that twelve components were not installed: the propulsion system; traction system; cooling system; heating and air conditioning; electrical system; bumpers; seats and stanchions; side windows; interior lighting; exterior lamps; passenger signals; and non-standard customer options.

become narrower, the alleged falsehoods become less likely to be material. That is particularly so where the question for Customs was not whether every component and subcomponent in the protest was present, but whether the bus shells had the "essential character" of buses. When it answered that question in the affirmative, Customs did not rely on the presence of any specific component. Instead, its decision found in broad terms that the bus shells "contain[ed] a substantial amount of equipment and number of components necessary for a completed transit bus." Thus, we find no reason to believe that the particulars proffered by Sanders had any bearing on Customs' holistic analysis.

Sanders, however, takes vigorous exception to the actions of both Customs and the district court. First, Sanders attempts to find fault with the district court's precise expression of the materiality standard. He argues that the district court applied the incorrect test by analyzing whether the missing components or subcomponents in the protest "would have," rather than "could have," affected Customs' decision. But the district court expressly found a lack of materiality under the "could have" formulation pressed by Sanders. JA 1430. And regardless, the materiality inquiry does not turn on questions of "would have" versus "could have." The standard is whether NABI's alleged false statements had "a natural tendency to influence agency action or [were] capable of influencing agency action." *Berge*, 104 F.3d at 1460. Under that standard, the false statements alleged by Sanders were immaterial to Customs' decision.

Sanders also disagrees with the determination by Customs that NABI's bus shells were properly classified as motor vehicles. Sanders thinks that the shells were so incomplete that they should have been classified under the alternative subheading for "bodies," and he goes on at length about 39 components that he asserts were missing from the shells. But of those 39 supposedly missing components, Sanders points to only 3 that were listed in NABI's protest as being present in

the bus shells. *Brief of Appellant* at 10-12. NABI also explicitly told Customs that many more of those 39 components were not included with its shells. And Sanders conceded at oral argument that NABI had made no misrepresentation to Customs regarding most of these 39 components. Furthermore, the Customs decision reflected the agency's knowledge that NABI's bus shells were far from complete. The decision stated that the bus shells arrived in the United States in an "unfinished state" and that only then were "the remaining necessary parts . . . installed to complete the transit bus[es]." Yet Customs still decided that NABI's bus shells had the "essential character" of motor vehicles. When Sanders complains that too many components were missing from NABI's bus shells for the shells to be classified as motor vehicles, he is therefore complaining not about misconduct by NABI, but about the Customs decision itself. Sanders may think that Customs' decision was wrong, but that does not make NABI's statements materially false.

## IV.

Sanders next contends that the district court erred when it granted summary judgment to NABI on Count IV of Sanders's complaint. Sanders claimed in Count IV that—prior to its successful protest—NABI underpaid its duties to Customs because the company failed to declare as part of the value of its bus shells the payments that it made to NABI Hungary for engineering and technology services.

We agree with the district court that Sanders failed to satisfy the fourth element of a cause of action under the FCA: that NABI's allegedly false statement or conduct "caused the government to pay out money or to forfeit money due." *Harrison*, 352 F.3d at 913. Because Customs determined that NABI's bus shells qualified for duty-free treatment under the HTSUS subheading for motor vehicles, NABI owed no duties on its imports, regardless of their declared value. Thus, even if NABI declared less than the correct value, NABI did not

avoid any obligation to pay money to the government, 31 U.S.C. § 3729(a)(7), and the government forfeited no money that it was due.

Sanders responds with a creative—yet erroneous— argument. Sanders points out that when NABI filed its protest with Customs in 1998, statutory deadlines prevented the company from obtaining refunds of duties that it had paid before April 1997. Had NABI declared a larger value for its imports prior to April 1997, therefore, Sanders observes that NABI could not have recovered any of the extra duties that it would have paid. From this, Sanders concludes that the government suffered a loss in the additional amount that it would have received—and kept—had NABI declared the full value of its imports prior to April 1997.

Sanders's argument fails because the availability of a refund is irrelevant to the issue of whether the government forfeited money that it was due in the first place. Even if NABI could not obtain a refund of past duties, the Customs decision demonstrated that NABI should have been paying no duties all along. Thus, NABI cannot be said to have cheated the government out of anything that it was due. In fact, the earlier misclassification of NABI's imports worked in the government's favor by erroneously subjecting those imports to taxation. And the only reason that the limitations period on refunds bears any significance is that it saved the government from making NABI whole on its overpayments. Sanders essentially argues that NABI should be liable for failing to provide the government an additional windfall. That argument cannot sustain the fourth element of an FCA claim, so we affirm the district court's grant of summary judgment on Count IV.[6]

---

[6]Sanders also appeals the district court's dismissal of his anti-retaliation claim under Section 3730(h). Sanders concedes, and we agree, that the district court correctly dismissed that claim as time-barred under the Supreme Court's decision in *Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 545 U.S. 409 (2005). Sanders contends that his claim should be reinstated if Congress enacts legislation to overrule the result in *Wilson*. No such legislation has been enacted, so we affirm on this claim also.

V.

While this appeal was pending, Sanders submitted what he styled as two pieces of supplemental authority regarding developments within the past year: claims that Customs reclassified certain bus shells that NABI imported in December 2007, and claims that the government is investigating NABI for possible criminal violations relating to the classification of its imports. Our decision expresses no view whatsoever on these contentions. They are not part of the record before us, and we refuse to speculate as to the potential outcome of any ongoing investigations. Our decision tenders no general assessment on NABI's past, current, or future conduct. We hold only that on the record in this case, the district court properly granted the defendants' motions to dismiss and for summary judgment. The district court's judgment is therefore

*AFFIRMED*.