AGEE, Circuit Judge,
concurring in part and dissenting in part:
I concur with the majority opinion that the “first-to-file” rule does not act as a barrier to Benjamin Carter’s qui tarn action against Halliburton, Kellogg Brown & Root, and Service Employees International (collectively “KBR”). However, I do not agree with the holding in the majority opinion, principally section III D, that the Wartime Suspension of Limitations Act *188 (“WSLA”), 18 U.S.C. § 3287, tolls the six-year limitations period set forth in the False Claims Act (“FCA”), 31 U.S.C. § 3731(b)(1), when the United States is not the plaintiff or an intervenor. For that reason, I respectfully dissent from the majority opinion insofar as it would allow Carter to proceed on those of his claims that fall outside the six-year FCA limitations period.
I.
Pursuant to 31 • U.S.C. § 3731(b)(1), a civil action under the FCA may not be brought more than six years after the date on which the alleged violation was committed. In this case, the vast majority of Carter’s claims against KBR stem from violations that allegedly took place before May 1, 2005.[1] Pursuant to § 3731(b)(1), therefore, Carter had until May 1, 2011, to file his qui tam complaint against KBR for it to be deemed timely. The latest iteration of Carter’s complaint, however, was not filed until June 2, 2011. Thus, absent tolling, in some form, the bulk of Carter’s claims are barred by the FCA’s limitations period because they did not take place within six years of the filing of the complaint.[2]
In 1942, Congress unanimously approved the first version of the WSLA, which temporarily suspended the statute of limitations in criminal contracting fraud cases arising out of the Second World War. See Act of August 24, 1942, 56 Stat. 747. Congress amended the WSLA in 1948, and the majority concludes that the effect of those amendments was to extend the reach of the WSLA to civil limitations periods, not merely those arising in the criminal fraud context. See Act of June 25, 1948, 62 Stat. 683, 828. The majority may be correct, but the issue is not without doubt.[3]
In 2011, at the time Carter filed his complaint, the WSLA provided:
When the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces ... the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancelation, or other termination or settlement, of any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war or directly connected with or related to the authorized use of the Armed Forces, or with any disposition of termination inventory by any war contractor or Government agency, shall be sus *189 pended until 5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress. For purposes of applying such definitions in this section, the term “war” includes a specific authorization for the use of the Armed Forces.
18 U.S.C. § 3287.[4]
Carter argues that, by operation of the WSLA, the FCA limitations period was suspended in 2005, at the time KBR submitted allegedly false claims to the United States for payment. Accordingly, Carter posits (and the majority opinion agrees) that the WSLA precludes KBR from asserting the statute of limitations as a defense in this case. For reasons explained below, I do not agree with that construction of the WSLA.
II.
A.
This appeal presents a quintessential question of statutory interpretation, which we review de novo. In re Maharaj, 681 F.3d 558, 568 (4th Cir.2012).
“As in all cases of statutory interpretation, our inquiry begins with the text of the statute.” Chesapeake Ranch Water Co. v. Bd. of Comm’rs of Calvert Cnty., 401 F.3d 274, 279 (4th Cir.2005). “In that regard, we must first determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute ... and our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent.” United States v. Bly, 510 F.3d 453, 460 (4th Cir.2007) (quoting United States v. Hayes, 482 F.3d 749, 752 (4th Cir.2007) (omission in original)). “We determine the ‘plainness or ambiguity of the statutory language ... by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.’ ” United States v. Thompson-Riviere, 561 F.3d 345, 354-55 (4th Cir.2009) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (omission in original)).
B.
I note at the outset that no case has ever held (other than in dicta) that the WSLA applies to civil cases where the United States is not a plaintiff or intervenor in the qui tam action. In the only case in which a court suggested the WSLA did so apply, United States ex rel. McCans v. Armour & Co., 146 F.Supp. 546 (D.D.C.1956), the court’s conclusion was not the ratio decendi of the decision and was clearly dicta. In McCans, the relator brought a qui tam complaint against Armour & Co., a government contractor, alleging that Armour sold certain pork products to war procurement agencies at prices *190 in excess of limitations set by Congress during World War II. Although the allegedly illegal sales were conducted between 1942 and 1943, the relator did not file her complaint until 1954. While the district court discussed the application of the WSLA tolling provisions to the relator’s complaint, it concluded that the complaint was not timely filed, even if WSLA tolling were applicable. Id. at 551. Any discussion of WSLA tolling in McCans was thus clearly unnecessary to the district court’s holding that the suit was untimely. Accordingly, the court’s references to the WSLA’s applicability to private plaintiffs is mere dicta. See Perez v. Mountaire Farms, Inc., 650 F.3d 350, 373 (4th Cir.2011) (“This additional observation was not necessary to the Court’s resolution of the ... issue that was the basis of its holding, and we therefore conclude that the observation is merely dicta.”); Bettius & Sanderson, P.C. v. Nat’l Union Fire Ins. Co., 839 F.2d 1009, 1019 n. 3 (4th Cir.1988) (Murnaghan, J., concurring in part and dissenting in part) (“To reach out and decide what need not be decided is frequently denigrated as dictum.”).
C.
As there is no direct authority for application of the WSLA here, I find the reasoning in United States ex rel. Sanders v. North American Bus Industries, Inc., 546 F.3d 288 (4th Cir.2008), a persuasive guide to our disposition of this issue. Sanders concerned the construction of 31 U.S.C. § 3731(b), the FCA’s limitations provisions; the same statute providing the statute of limitations in this case. That statute provides that
[a] civil action under [the FCA] may not be brought — ■
(1) more than 6 years after the date on which the violation of [the FCA] is committed, or
(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
whichever occurs last.
31 U.S.C. § 3731(b). The Sanders relator, whose complaint was filed beyond the six-year limitations period described in § 3731(b)(1), sought to avail himself of § 3731(b)(2), which runs the limitations period from the time the United States receives (or reasonably should receive) notice of the violation. We rejected that attempt.
Although we observed that § 3731(b) applied to “civil action[s]” under the FCA, we held that the language of § 3731(b)(2) could only be logically applied when referring to an action brought by the United States, not by a private relator. Id. at 294. In support of this holding we reasoned that “applying the statute’s language to a relator’s action makes no sense whatsoever. The government’s knowledge of ‘facts material to the right of action’ does not notify the relator of anything, so that knowledge cannot reasonably begin the limitations period for a relator’s claims.” Id.
The Sanders court also made important observations about the practical effect of allowing a private relator to claim the benefit of a statutory limitations period intended for the benefit of the government. It noted that extending the limitations period for up to 10 years (the outer limit provided by § 3731(b)(2)) in the case of a private relator would create incentives contrary to the purposes of the FCA. Id. at 295. “[R]elators would have a strong financial incentive to allow false claims to build up over time before they filed, there *191 by increasing their own potential recovery.” Id. Critically, the court went on to note that the relator’s proposed construction would undermine the very purpose of the qui tam provisions of the FCA: “to combat fraud quickly and efficiently by encouraging relators to bring actions that the government cannot or will not.” Id.
Following the reasoning of Sanders in the instant case, I agree with the holding of the district court that application of the WSLA to a suit brought by a private relator is inconsistent with the WSLA and its legislative history and would be contrary to the articulated goals of the FCA. Let me explain why that is so.
At first blush, Carter is correct that the WSLA applies to “any offense,” involving fraud against the United States (obviously, when certain conditions are met). But to read “any offense” as encompassing actions by private relators is a superficial reading of the WSLA and fails to construe the statute in context. By the terms of the WSLA, the government is solely entitled to invoke and terminate the tolling provisions of the that statute, however, the text of the WSLA is entirely silent as to private relators. The triggering and terminating provisions of the WSLA are both related to and solely controlled actions of the United States government: declaration of war or congressional authorization for use of military force (to trigger) and congressional resolution or Presidential proclamation (to terminate). In either circumstance, Congress and the President possess the unique power to invoke the WSLA to toll the limitations period for fraud offenses: a period when the same government is thus released from a looming time bar to bring an FCA claim. The private qui tam plaintiff has no connection with these decisions and it seems odd to conclude that such a private plaintiff, absent a clear statutory direction, should be entitled to the same limitations period as the necessary actor, the government. There is no such clear statutory direction.
In Sanders, we declined to find that the private party relator could latch onto the § 3731(b)(2) exception since the relator was neither mentioned in the statute or legislative history as authorized to do so. Similarly, here with the WSLA, we find no mention of the private party relator in the statute or its legislative history: again, an odd basis upon which to extend the tolling of a statute of limitations which is to be strictly construed. See Bridges v. United States, 346 U.S. 209, 215-16, 73 S.Ct. 1055, 97 L.Ed. 1557 (1953) (holding that, because the WSLA is an exception to the “longstanding congressional policy of repose,” it is “to be liberally interpreted in favor of repose”).
Simply reading “any offense” to encompass all offenses regardless of whether the United States is the plaintiff, is inconsistent with the nuanced approach that courts have employed when reading the “civil action” language in § 3731(b). We reasoned in Sanders that “a civil action” should not be read to encompass all FCA actions, but rather, should be read in context to include only those actions brought by the United States. Sanders, 546 F.3d at 294-95. Here, the WSLA (like § 3731(b)(2)) mentions the United States, not private rela-tors. Thus the text of the WSLA, on its own, supports the proposition that only the United States may take advantage of its tolling provisions. Nevertheless, I also find that this interpretation is consistent with the purposes and legislative history of the WSLA.
D.
The Supreme Court has described the rationale underlying the passage of the WSLA during World War II as follows:
*192 The fear was that the law-enforcement officers would be so preoccupied with prosecution of the war effort that the crimes of fraud perpetrated against the United States would be forgotten until it was too late. The implicit premise of the legislation is that the frenzied activities, existing at the time the Act became law, would continue until hostilities terminated and that until then the public interest should not be disadvantaged.
United States v. Smith, 342 U.S. 225, 228-29, 72 S.Ct. 260, 96 L.Ed. 252 (1952); see also id. at 230, 72 S.Ct. 260 (Clark, J., concurring) (“Soon after the beginning of World War II, Congress realized-that it would be impossible for the Department of Justice currently to investigate and prosecute the large number of offenses arising out of the war effort. Therefore Congress suspended the running of the statute of limitations as to frauds against the Government. ... It is clear that Congress intended to give the Department more time to apprehend, investigate, and prosecute offenses occurring ‘under the stress of present-day events’ of the war.”).
In other words, the Court recognized that the primary concern motivating Congress in passing the WSLA was the ability of law enforcement to effectively police fraud against the government during the fog of war. See, e.g., 21 Am.Jur.2d Criminal Law § 264 (2013) (“The purpose of the [WSLA] is to give government law enforcement officials additional time to discover and punish offenses related to the commercial aspect of war programs, where extensive war efforts render them unable to deal with those offenses within the normal period of limitation.” (emphasis added)). This concern is evident in the WSLA’s legislative history.
During normal times the present 3-year statute of limitations may afford the Department of Justice sufficient time to investigate, discover, and gather evidence to prosecute frauds against the Government. The United States, however, is engaged in a gigantic war program. Huge sums of money are being expended for materials and equipment in order to carry on the war successfully. Although steps have been taken to prevent and to prosecute frauds against the Government, it is recognized that in the varied dealings opportunities will no doubt be presented for unscrupulous persons to defraud the Government or some agency. These frauds may be difficult to discover as is often true of this type of offense and many of them may not come to light for some time to come. The law-enforcement branch of the Government is also busily engaged in its many duties, including the enforcement of the espionage, sabotage, and other laws.
Bridges, 346 U.S. at 217 n. 18, 73 S.Ct. 1055 (quoting S.Rep. No. 1544, 77th Cong.2d Sess.). Once again, the concern of Congress, as expressed in the legislative history, was the inability of the Department of Justice and other federal law-enforcement entities to effectively prevent and prosecute fraud in light of other duties antecedent to waging war. The legislative history makes no mention of private plaintiffs bringing relator actions against those allegedly engaged in fraud.
The legislative history of the Wartime Enforcement of Fraud Act of 2008 (“WEFA”), Pub.L. No. 110-417 § 855, which contained the most recent amendments to the WSLA, reveals that the same concerns motivated Congress in passing the 2008 amendments to the WSLA. In sending the WEFA to the full Senate, the Judiciary Committee report repeatedly emphasized the difficulty of investigators, auditors, and the Department of Justice in ferreting out fraud against the United *193 States during the conflicts in Iraq and Afghanistan. See S.Rep. No. 110-431. Again, the legislative history is silent with respect to private party relators.
The purpose of the WSLA (as articulated by the Supreme Court) and the legislative history of that statute confirm what the text reflects: that Congress was concerned with the ability of the federal government to police fraud when the resources of its law enforcement were stretched thin by war. Tolling afforded law enforcement the ability to thoroughly investigate allegations of fraud without compromising the ability of the United States to fulfill its military mission. Unlike federal law enforcement, private rela-tors are not “busily engaged in ... many duties, including the enforcement of the espionage, sabotage, and other laws.” Bridges, 346 U.S. at 217 n. 18, 73 S.Ct. 1055 (quoting S.Rep. No. 1544). And extending the benefits of tolling to private relators does not “afford the Department of Justice sufficient time to investigate, discover, and gather evidence to prosecute frauds against the Government.” Id. In sum, Congress has shown no intent to toll the FCA’s limitations period when the United States is not a plaintiff to the FCA action.
The complete silence as to relators in the legislative history of the WSLA is all the more telling when one considers that the FCA, which was originally passed in 1863, was on the books when the Congress considered the WSLA in 1942 and the WEFA in 2008. “Faced with statutory silence, we presume that Congress is aware of the legal context in which it is legislating.” Palisades Collections LLC v. Shorts, 552 F.3d 327, 334 n. 4 (4th Cir.2008) (quoting Progressive W. Ins. Co. v. Preciado, 479 F.3d 1014, 1017-18 (9th Cir.2007) (internal alterations omitted)). Thus, the fact that Congress did not mention qui tam plaintiffs in the legislative history of any version of the WSLA strongly suggests that Congress did not intend for the tolling provisions of that statute to reach indiscriminately to any private plaintiff pursuing a claim for fraud against the government.
E.
Looking finally to the policies underlying the FCA, the majority’s interpretation of the WSLA is plainly at odds with the goals of the FCA. The policy concerns underlying the FCA will be directly thwarted by allowing private relators to take advantage of the WSLA’s tolling provisions. In this case, for example, Carter’s claims arose in 2005, and application of the WSLA would extend the limitations period for his actions well into the next decade at least, depending on the date hostilities in Iraq are deemed terminated. Assuming for the sake of argument, as the district court did, that the August 31, 2010, presidential statement of “the end of our combat mission in Iraq” was sufficient to end the tolling provisions of the WSLA,[5] (J.A. 628 n.33.), Carter would have until 2019, nearly fourteen years after his claims accrued, to file a qui tam action. Before the district court, Carter argued that hostilities in Iraq have not formally ended, meaning that the limitations period would still be tolled today, seven years after the allegedly false claims were presented to the government. When (and if) hostilities are formally declared terminated in Iraq, it could be up another eleven years (five years after termination of hostilities pursuant to the WSLA, plus the normal six year *194 limitations period prescribed in § 3731(b)(1)) before the limitations period would be deemed to have ended.[6] Such an expansive limitations period applicable to private qui tarn plaintiffs is unsupported by statute, legislative history, or precedent.
In this respect, Sanders is again instructive, because it accurately described the differing incentive structures that motivate relators, as opposed to law enforcement, in the context of FCA actions. As Sanders explained, a lengthy limitations period would create a “strong financial incentive” for relators to “allow false claims to build up over time before they filed, thereby increasing their own potential recovery.” Sanders, 546 F.3d at 295. The government, on the other hand, always has an incentive to quickly act to root out fraud against the United States. The lengthy limitations period of the WSLA, therefore, is uniquely helpful to a government that is otherwise hampered from enforcing anti-fraud laws by the externalities of waging a military conflict. Applying that same lengthy limitations period to relators is uniquely problematic because doing so thwarts the whole purpose of the FCA: “to combat fraud quickly and efficiently by encouraging relators to bring actions that the government cannot or will not — to stimulate actions by private parties should the prosecuting officers be tardy in bringing the suits.” Id. (quoting United States ex rel. Marcus v. Hess, 317 U.S. 537, 547, 63 S.Ct. 379, 87 L.Ed. 443 (1943)) (internal quotation marks omitted).
In fact, the concern identified by Sanders is exacerbated in the context of wartime enforcement of anti-fraud laws. As the legislative history to the WEFA notes, “often,” during war, “the Government does not learn about serious fraud until years after the fact.” S.Rep. No. 110-431. In contrast, private party relators will be inclined to delay, allowing their potential recovery to increase, knowing that the government is unlikely to discover the fraud, and therefore unlikely to be the first to bring a claim against the perpetrators. Absent WSLA tolling, relators are at least restricted to a six year window in which to bring their claims. In the context of virtually indefinite WSLA tolling, however, a relator could wait a decade or more to bring a qui tam claim, secure in the knowledge that law enforcement is otherwise too occupied with the exigencies of war to discover the fraud on its own.
F.
The majority opinion does not address the arguments set forth above, but summarily dismisses Sanders as inapplicable because, “whether the suit is brought by the United States or a relator is irrelevant to this case because the suspension of limitations in the WSLA depends on whether the country is at war and not who brings the case.” Ante at 180. This is a misreading of Sanders, the statute, and the legislative history. Like the WSLA, the limitations period at issue in Sanders did not contain an express limitation on who could take advantage of the tolling provision. Rather, the analysis in Sanders focused on *195 whether § 3731(b)(2) could be plausibly read to encompass actions brought by private parties. Like § 3731(b)(2) in Sanders, the WSLA should be read in context, keeping in mind both the purposes of that statute and the dire effects of extending to relators a provision obviously intended only for the government.
III.
The text, the purposes, and the legislative history of the WSLA all counsel in favor of holding that the government only, and not private relators, are entitled to take advantage of that statute’s tolling provisions. Because the majority takes the altogether novel step of expanding the WSLA to apply to actions by relators, I must respectfully dissent from that aspect of the majority’s holding.

. Carter alleges that KBR fraudulently submitted one voucher to the United States, totaling $673.56, on June 15, 2005. Because this was within six years of the filing of Carter’s complaint in 2011, Carter’s FCA claim related to that voucher is timely.

. In addition to seeking to avail himself of tolling pursuant to the WSLA, Carter argued before the district court and on appeal that he is entitled to the benefit of equitable tolling. Although observing that his equitable tolling claim was improperly before the court, the district court alternatively held that "Carter cannot show that the instant suit is untimely due to circumstances external to his own conduct, and equitable tolling is inappropriate.” (J.A. 620 n.l 1). I agree with the district court that equitable tolling is unavailable to Carter.

.Because I would hold that the WSLA does not apply in this case, I would merely assume, without deciding, that the WSLA applies to civil actions generally.

. The majority opinion does not reach the question of whether the pre- or post-2008 version of the WSLA applies to Carter’s qui tom complaint. Ante at 177-78. If the WSLA applies to this case at all (and I believe that it does not), it seems most likely that the post-2008 version of the statute would apply. This is so because the amendments at issue concern the limitations period for FCA actions and not the underlying conduct at issue. See Forest v. USPS, 97 F.3d 137, 140 (6th Cir. 1996) (new statute of limitations has prospective application because it applies to the filing of a complaint, which occurred after the statute was enacted); hut see Chenault v. USPS, 37 F.3d 535, 539 (9th Cir.1994) (“[NJewly enacted statute that lengthens the applicable statute of limitations may not be applied retroactively to revive a plaintiff's claim that was otherwise barred under the old statutory scheme.”).
Thus, for purposes of this dissent, I will assume that if any version of the WSLA applies, it is the version as amended in 2008.

. It is not clear that this declaration meets the statutory prerequisites to end tolling as a matter of law, given the requirement contained in the WSLA that the President give formal notice to Congress that hostilities are terminated. See 18 U.S.C. § 3287.

. The majority opinion criticizes the district court for opining that the adoption of Carter’s construction of the WSLA could permit the statute of limitations "to extend perhaps indefinitely.” Ante at 181. But it is clear from the WSLA itself that tolling will continue until either the President makes a proclamation of termination of hostilities with formal notice to Congress, or Congress passes a concurrent resolution to the same effect. The record does not conclusively reflect that either Congress or the Chief Executive have acted in the manner contemplated by the statute. If they have not done so, tolling will indeed extend indefinitely.