35 F.3d 997
 UNITED STATES of America, Plaintiff-Appellee,
v.
Ronald Allyn FIEL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Todd D. SAULNIER, a/k/a Easy, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John H. LEA, Jr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael W. O'BIER, Defendant-Appellant.
 Nos. 93-5032, 93-5033, 93-5034 and 93-5035.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 13, 1994.
Decided Sept. 30, 1994.
 
 ARGUED: Gregory Beckwith, Phillips, Beckwith & Hall, Fairfax, VA, for appellant O'Bier; Blair Duncan Howard, Howard & Howard, Alexandria, VA, for appellant Lea; James M. Lowe, Alexandria, VA, for appellant Saulnier; Gregory Edward Stambaugh, Brown & Stambaugh, Alexandria, VA, for appellant Fiel. John Patrick Rowley, III, Asst. U.S. Atty., Alexandria, VA, for appellee. ON BRIEF: Helen F. Fahey, U.S. Atty., Marcus J. Davis, Asst. U.S. Atty., Nicole M. Healy, Sp. Asst. U.S. Atty., Alexandria, VA, for appellee.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and HARVEY, Senior United States District Judge for the District of Maryland, sitting by designation.
 Affirmed in part and reversed and remanded in part by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge MURNAGHAN and Senior Judge ALEXANDER HARVEY, II joined.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 This case arises out of a series of events involving the Fates Assembly Motorcycle Club, headquartered in Baltimore. The Fates became involved in attempts to avenge the death of one of their members, Richard Capote, at the hands of Kirby Gallaghan, a member of the rival Pagan's Motorcycle Club. The Fates' various attempts, however, caused only the death of one of their own, George Hughes.
 
 
 2
 Twelve Fates members were indicted in connection with the attempted murder, and eight pled guilty. Beginning August 3, 1992, the four remaining defendants, Ronald Fiel, John Lea, Michael O'Bier and Todd Saulnier, stood trial on a Second Superseding Indictment alleging violations as follows:
 
 
 3
 Count 1--all defendants: 18 U.S.C. Sec. 1959(a)(1), Conspiracy to commit violent crimes to maintain or increase position in an enterprise engaged in racketeering activity;
 
 
 4
 Count 2--Fiel, Saulnier: 18 U.S.C. Sec. 1959, Conspiracy to murder a government witness to maintain or increase position in an enterprise engaged in racketeering activity;
 
 
 5
 Count 3--Lea: 18 U.S.C. Sec. 1959, Aiding and abetting or attempting to murder with a firearm to maintain or increase position in an enterprise engaged in racketeering activity on July 26, 1991; and
 
 
 6
 Count 5--O'Bier, Saulnier: 18 U.S.C. Sec. 1959, Aiding and abetting or attempting to murder with an M-1 rifle and pipe bombs to maintain or increase position in an enterprise engaged in racketeering activity in August, 1991.
 
 
 7
 The jury acquitted all defendants on Counts 2 and 3, and Saulnier on Count 5. The jury was unable to reach a verdict on Count 1 and on Count 5 with respect to O'Bier. Accordingly, on August 6, 1992, the court sua sponte declared a mistrial with respect to those counts without objection. That trial thus resulted in no convictions.
 
 
 8
 On August 19, 1992, the Grand Jury returned a Third Superseding Indictment, realleging Count 1 against all the defendants (new Count 1) and Count 5 with respect to O'Bier (new Count 2). The indictment also brought two new counts against defendants Fiel and Lea, alleging that they violated 26 U.S.C. Sec. 5861 by manufacturing a destructive device (new Count 3) and that they violated 18 U.S.C. Sec. 1959 by attempting to commit murder with a destructive device on October 4, 1991 to maintain or increase their position in an enterprise engaged in racketeering activity (new Count 4). Defendants moved for dismissal of the Third Superseding Indictment on the ground of prosecutorial vindictiveness. Their motion was denied.
 
 
 9
 This final indictment came to trial on September 30, 1992. Defendants were found guilty on all counts on October 9, 1992. Defendants were sentenced on December 11, 1992 as follows: Fiel--96 months on each of Counts 1, 3 and 4 to run concurrently; Lea--84 months on each of Counts 1, 3 and 4 to run concurrently; Saulnier--63 months on Count 1; and O'Bier--60 months on each of Counts 1 and 2 to run concurrently. Defendants appeal their convictions, making numerous assignments of error. For the reasons set out below, we affirm the convictions of Fiel, Lea and O'Bier, and reverse Saulnier's conviction and remand his case for a new trial.
 
 I.
 
 10
 The Fates were a motorcycle club headquartered in Baltimore with local chapters in Woodbridge, Virginia (Northern Chapter); Fredericksburg, Virginia (Southern Chapter); and South Carolina. Fiel was national president of the club, although he retired in June, 1991. Saulnier was a member with no official position. Lea was Southern Chapter President and O'Bier was Southern Chapter Vice-President. Total membership in the club was approximately 60 members. The Pagans were a rival club with chapters all over the East Coast and a total membership between 600 and 900. The Fates and the Pagans had a tense relationship, made worse after a fight in the spring of 1991 between Capote and a Pagan member. Shortly thereafter, Fiel arranged for the club to obtain explosives in case the club needed them for use against the Pagans.
 
 
 11
 On July 26, 1991, the Northern Virginia chapter of the Fates congregated at the Woodbridge Inn in Woodbridge, Virginia to attend a field party where Pagan members were to have been located. Pagan Kirby Gallaghan pulled his truck into the parking lot of the inn and was noticed by the Fates. Capote approached Lea, Chapter President, and expressed his desire to "get" Gallaghan. Lea allegedly responded, "Go get him," permitting Capote to act. Capote and Melvin Payne got into a van driven by Payne and followed Gallaghan, who left the parking lot. As the van pulled adjacent to the vehicle driven by Gallaghan, Capote fired a weapon at Gallaghan. The shot blew out the driver's side window, but did not injure Gallaghan. Gallaghan returned fire, fatally striking Capote in the head.
 
 
 12
 Following Capote's funeral service on July 27, 1991, the Fates had a meeting at Fiel's house with all defendants in attendance. Mark Fiel (defendant Ronald Fiel's brother) told club members that the war against the Pagans would be stepped up and that if anyone got a chance to kill a Pagan and get away with it, they should go ahead and do it. Members were told that if anyone wanted to get out of the club, now was the time. Another meeting with defendants present took place in the first week of August, at which it was decided to do surveillance work to prepare ambushes on the Pagans. Some time after this meeting, the members determined that a committee headed by Robert Paris would be in charge of the war.
 
 
 13
 In mid-August, two Fates threw a hand grenade at Gallaghan's house, but it failed to explode. At a meeting with all defendants in attendance in late August following that failed murder attempt, Mark Fiel informed those present that every club member would participate in the war against the Pagans. The club discussed surveillance work and how to prepare ambush attempts.
 
 
 14
 In late August, several Fates attempted to ambush Gallaghan and other Pagans with pipe bombs and rifles. Saulnier conducted surveillance of Pagan residences to determine patterns of Pagan movement. O'Bier drove the vehicle that was supposed to serve as the get-away car. The ambush attempt was unsuccessful on that occasion, but O'Bier agreed to serve as driver on another attempt. Several other unsuccessful ambush attempts were made in August by Fates members, but no defendant was directly involved.
 
 
 15
 In early September, the Fates decided to build a remote-control bomb for use against the Pagans. On or about September 12, 1991, George Hughes and Lee Clifton constructed a bomb that was placed upon a vehicle driven by Pagan members. The bomb detonated and it blew the gas tank and back wheel off of the vehicle. This attempt did not harm the Pagan passengers. Mark Fiel then called a meeting that all defendants attended. They discussed building another, stronger bomb. Thereafter, Lea provided Paris and Reed with explosives.
 
 
 16
 On October 2, 1991, Paris told Lea that the second bombing attempt was about to take place and that he needed some help. Lea sent Payne to help and Lea left for vacation in Florida. On October 4, 1991, Payne, Hughes and Paris drove to Gallaghan's residence. Payne stood guard with a rifle as Hughes attached the bomb to a car owned by one of Gallaghan's Pagan roommates. The bomb failed to go off as the Pagans drove it to work. Hughes retrieved the bomb from the parking lot of Gallaghan's workplace. After informing Fiel that they were going to try again, Hughes repaired the bomb. Paris, Hughes and Payne then returned to the parking lot. As Hughes was attempting to arm the bomb, it exploded, killing him and injuring Paris and Payne. Later in October, Reed obtained some additional explosives for future use against the Pagans. He showed Saulnier where they were buried in case Reed "got shot or went to prison."
 
 
 17
 In December 1991, Fate member Philip McFarland approached law enforcement authorities and indicated that he wanted to cooperate with the investigation of the October 4 bombing. McFarland thereafter entered into a plea agreement with the government and pled guilty to the unlawful possession of a destructive device. McFarland made twenty-two undercover tape recordings of conversations with other Fates members regarding the Pagans and the possibility of intimidating or killing Clifton's wife to keep Clifton quiet. Hughes and Clifton were close friends and Hughes' death greatly upset Clifton. Fates became worried about Clifton's behavior and thought he might talk to law enforcement officials. Clifton disappeared in March 1992 and was believed to be cooperating with the government. Clifton's wife, Kimberly, was serving in the army at Fort Bragg. Club members, including Saulnier, discussed the possibility of killing Kimberly to prevent Clifton from cooperating. In one taped conversation between McFarland and Saulnier, Saulnier said that in order to silence Clifton, they had to do "the obvious" to his wife, Kimberly.
 
 II.
 
 18
 Defendants claim that there was insufficient evidence to convict them of violating 18 U.S.C. Sec. 1959. We review sufficiency of the evidence challenges to determine whether, viewing the evidence in the light most favorable to the government, any reasonable jury could have reached the verdict at issue. United States v. Jackson, 863 F.2d 1168 (4th Cir.1989). Title 18 U.S.C. Sec. 1959 states that
 
 
 19
 (a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires to do so shall be punished....
 
 The statute further states
 
 20
 (b) As used in this section--
 
 
 21
 (1) "racketeering activity" has the meaning set forth in section 1961 of this title [RICO]; and
 
 
 22
 (2) "enterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce.
 
 
 23
 18 U.S.C. Sec. 1959(b). The legislative history of the statute indicates that "enterprise" in this section and in RICO are intended to "have the same scope." 1984 U.S.C.C.A.N. 3182, 3486.
 
 
 24
 To establish a Sec. 1959 claim, the government must prove beyond a reasonable doubt,
 
 
 25
 (1) that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise.
 
 
 26
 United States v. Concepcion, 983 F.2d 369, 381 (2d Cir.1992), cert. denied, --- U.S. ----, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993).
 
 A RICO enterprise is
 
 27
 an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct.... [An enterprise] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.
 
 
 28
 United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 2928, 69 L.Ed.2d 246 (1981). The hallmark concepts that identify RICO enterprises are "continuity, unity, shared purpose and identifiable structure." United States v. Griffin, 660 F.2d 996, 1000 (4th Cir.1981), cert. denied, 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 313 (1982). In United States v. Tillett, 763 F.2d 628, 631 (4th Cir.1985), this court found
 
 
 29
 evidence of the ongoing nature of the organization related to the operational structure of the group. Although the faces in the group may have changed, there was substantial evidence of a structure within the group within which the various associates operated according to their specific function....
 
 
 30
 Furthermore, the Supreme Court has recently decided that RICO does not require proof that either the enterprise or the predicate acts of racketeering are motivated by an economic purpose. NOW v. Scheidler, --- U.S. ----, ----, 114 S.Ct. 798, 800, 127 L.Ed.2d 99, 105 (1994).
 
 The government's indictment alleged that
 
 31
 a group or confederation comprised of members of the [Fates] Northern Virginia Chapter, and certain members of the Southern Virginia Chapter, constituted an "enterprise" within the meaning of Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact, although not a legal entity, for the common purpose of participating in an organized motorcycle club.
 
 
 32
 As the government reiterated in closing argument, "the enterprise ... was ... the Northern Virginia chapter and certain individuals from the Southern Virginia chapter ... [associated] for the purpose of riding motorcycles and drinking beer--to be a motorcycle club." J.A. 325.
 
 
 33
 The Fates was a group of individuals with an identifiable structure associated for a common purpose. The club had officers and by-laws; members passed through various levels of membership before becoming full "1% members," meaning the 1% of society who refuse to follow its rules. It was a continuing entity, with some members retiring as new members joined. The club raised money through dues, fines, raffle tickets and tickets to club-sponsored parties. A percentage of each chapter's revenue went to the national club. The club clearly falls within the statutory definition of an "enterprise."
 
 
 34
 The court must next determine whether the enterprise was engaged in racketeering activity. "Racketeering activity means (A) any act or threat involving murder, ... or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year...." 18 U.S.C. Sec. 1961(1). The indictment charged that the club facilitated the dealing and distribution of narcotics. The evidence showed that members of the club dealt drugs to other members at a discounted "club price" and to those outside the club at the street price. The enterprise facilitated drug dealing by holding public parties at which drugs were sold and used. Drugs were routinely used before and after club meetings with the approval of the club officers. The officers established rules that members could not use PCP, injectable drugs or crack cocaine. Club leaders exercised control over drug sales and use by banning drug use for short periods of time. Club loans were made from the treasury to buy drugs. There was evidence that all defendants either purchased or sold drugs in association with the club. There was sufficient evidence to determine that the club was engaged in racketeering activity.
 
 
 35
 The court must next determine whether each defendant had a position in the enterprise. The defendants' brief concedes that Fiel was national president of the club, but had retired in June of 1991; Saulnier was a member of the club; Lea was the Southern Chapter President; and O'Bier was eventually elected the Southern Chapter Vice-President. Each defendant therefore had a position in the enterprise.
 
 
 36
 The court's fourth duty is to decide whether there was sufficient evidence that each defendant conspired to commit the violent crimes charged. The evidence showed that each defendant was present at a meeting in which plans to murder Pagans were discussed. At a minimum, the evidence showed that Fiel obtained explosives for the club, Saulnier conducted surveillance of Pagans, Lea stored and delivered explosives, and O'Bier drove the get-away car in an ambush attempt. A rational jury could find that each defendant conspired to commit the violent acts charged.
 
 
 37
 Lastly, the court must determine whether each defendant committed the violent acts or agreed to commit the acts for the purpose of maintaining or increasing his position in the enterprise. The phrase "for the purpose of ... maintaining or increasing position in ..." the enterprise should be accorded its ordinary meaning. Concepcion, 983 F.2d at 381. The legislative history indicates that the phrase was added to proscribe murder and other violent crimes committed "as an integral aspect of membership" in such enterprises. Id. (quoting S.Rep. No. 225, at 304, reprinted in 1984 U.S.C.C.A.N. at 3483; see also id. at 306, reprinted in 1984 U.S.C.C.A.N. at 3486). "We consider the motive requirement satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." Concepcion, 983 F.2d at 381. The government presented evidence that defendants were told at meetings that all club members would be involved in the war against the Pagans and that if any member wanted to quit, he should leave at that time. One member, Bruce Jewel, did quit shortly thereafter because he did not want to become further involved with the club's activities. A rational jury could conclude that defendants believed that participation in the war against the Pagans was expected of them by reason of their membership in the Fates. Because there is sufficient evidence to support the Sec. 1959 convictions, the jury's verdict is affirmed.
 
 III.
 
 38
 Defendants argue that the district court improperly instructed the jury regarding the necessary relationship between the violent acts and the enterprise's racketeering activity. The elements of a statutory offense upon which the court must instruct the jury involve questions of law subject to de novo review. United States v. Daughtrey, 874 F.2d 213 (4th Cir.1989).
 
 
 39
 Defendants maintain that to support a Sec. 1959 conviction, the violent crimes charged must be committed for the purpose of aiding or furthering the racketeering activity. Because the violent acts at issue were in furtherance of revenge rather than their drug-related racketeering activity, defendants argue that they cannot be convicted under Sec. 1959. They rely on the title of Sec. 1959, on the legislative history of the RICO statute, and on case law interpreting the RICO requirement of a pattern of racketeering activity. We find none of their arguments persuasive.
 
 
 40
 Section 1959 is entitled "Violent Crimes in Aid of Racketeering Activity." It is clear, however, that "the title of an act cannot control its words...." United States v. Ivic, 700 F.2d 51, 61 (2d Cir.1983). Furthermore, where the statutory language is unambiguous, parties' submissions respecting legislative history must show a "clearly expressed legislative intent to the contrary that would warrant a different construction." Scheidler, --- U.S. at ----, 114 S.Ct. at 806, 127 L.Ed.2d at 111. Section 1959 clearly states that it is a crime for any person, as member of a RICO enterprise engaged in racketeering activity, to commit a proscribed act of violence in order to maintain or increase his position in the enterprise. Concepcion, 983 F.2d at 382. The language is unambiguous and requires no nexus between the act of violence and the racketeering activity. There is no need to resort to the legislative history of Sec. 1959, much less to that of RICO, a wholly separate statute. As RICO's legislative history is inapposite, so too is case law construing the "pattern of racketeering activity" requirement of that statute. Section 1959 contains no required "pattern" of racketeering activity. The district court correctly instructed the jury regarding the statutory requirements of conviction pursuant to Sec. 1959.
 
 IV.
 
 41
 Defendants claim that the district court improperly amended the indictment. In the district court's original charge to the jury, when reading Count 1, the judge read from the Second Superseding Indictment handed down in June, rather than the Third Superseding Indictment handed down in August. The mistake resulted in the jury being given the names of three Fates members not alleged to be coconspirators under the current indictment. Following the jury charge, the government pointed out the court's mistake and the court announced the correction to the jury. Defendants argue that the judge somehow amended the indictment by correcting his error. We find that the judge acted properly in promptly correcting a minor mistake. Defendants' claim borders on the frivolous, with no basis in fact or law. The district court did not improperly amend the indictment.
 
 V.
 
 42
 Defendants allege that the district court improperly admitted certain evidence that the government was collaterally estopped from introducing in the second trial. Collateral estoppel issues are reviewed de novo.
 
 
 43
 Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Ashe v. Swenson, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). The Supreme Court has held that
 
 
 44
 where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.
 
 
 45
 Id. at 444, 90 S.Ct. at 1194. To determine whether the issue should be precluded, the court must decide (1) whether the issue in question is identical to the previous issue, (2) whether it was actually determined in the prior adjudication, (3) whether it was necessarily decided in that proceeding, (4) whether the resulting judgment settling the issue was final and valid, and (5) whether the parties had a full and fair opportunity to litigate the issue in the prior proceeding. In order for the determination of an issue to be given preclusive effect, it must have been necessary to a judgment. United States v. Nash, 447 F.2d 1382, 1385 (4th Cir.1971) (citing Sealfon v. United States, 332 U.S. 575, 579, 68 S.Ct. 237, 239-40, 92 L.Ed. 180 (1948).
 
 A.
 
 46
 Lea challenges the admission of evidence regarding his alleged July 26, 1991 conversation with Capote in which Lea told Capote to "go get [Gallaghan]." Lea was acquitted at the first trial of aiding and abetting or attempting to murder Gallaghan on that date. Lea argues that the jury's decision must indicate that it decided the conversation between Lea and Capote did not take place. Lea concludes that the issue was therefore actually and necessarily decided in the first trial.
 
 
 47
 The record does not indicate that the jury actually decided whether the conversation took place. The jury could easily have determined that it did indeed take place, but did not rise to the level of aiding and abetting or attempting to murder Gallaghan. Because the jury could reasonably have grounded its verdict on an issue other than the one in question, the government was not collaterally estopped from admitting evidence of the conversation in the second trial.
 
 B.
 
 48
 Saulnier challenges the admission of evidence regarding his participation in surveillance of Pagan members in August 1991. Saulnier was acquitted of aiding and abetting or attempting to murder Pagans in the August ambush attempts. Saulnier argues that because the first jury found him not guilty of the attempted murders, it must have decided that he was not involved in the surveillance activity for any offensive purpose.
 
 
 49
 The jury could have determined, however, that Saulnier was involved in the surveillance, but that his involvement did not rise to the level of aiding and abetting or attempting to murder Pagans. There is no evidence that the issue was either actually or necessarily decided. The government was not collaterally estopped from introducing evidence of the surveillance at the second trial.
 
 C.
 
 50
 Saulnier also challenges the admission of evidence regarding his conversation with McFarland about silencing Kimberly Clifton. In the first trial, Saulnier was acquitted of conspiring to kill or intimidate Lee and Kimberly Clifton to prevent them from cooperating with law enforcement. It is axiomatic that to acquit Saulnier of this charge, the jury necessarily decided that Saulnier was not involved in the conspiracy to silence Kimberly Clifton.
 
 
 51
 At trial, the government introduced a tape recording of Saulnier's conversation with McFarland which included the following exchange:
 
 
 52
 McFarland: [expletive] Kimmie sitting down there laughing at us.
 
 
 53
 Saulnier: That would be the only way I could think of to shut Gadget [Lee Clifton] up.
 
 
 54
 McFarland: How's that? What do you mean?Saulnier: The obvious.
 
 
 55
 McFarland: Yep. You think any of those guys going to make a move towards that. Huh.
 
 
 56
 Saulnier: No way we can. It's funny how, we're all worried now you know, the [expletive] hit the fan and we got no friends. No bros to want to help or nothing, just Northern Virginia like it always was we're fighting war, we took a stand so we're the ones being hung. Now that we're being hung, ain't nobody around except us watch us swing.
 
 
 57
 Trial Transcript Vol. 4 at 233-36. In closing, the government argued that
 
 
 58
 if [Saulnier] was telling the truth, why was he talking about silencing Gadget? ... They're talking about how to shut Gadget up. [Saulnier] says: It's obvious, the way to shut Gadget up, and with that makes a slashing motion. You don't have to believe McFarland that he made a slashing motion, listen to that tape. It's obvious. McFarland, immediately after that says: Yup, you think any of those guys gonna make a move towards that. And then Saulnier says: No way we can. He didn't say, what are you talking about, are you nuts, making a move against the wife of one of our members. He didn't say anything of the sort. No way we can, ladies and gentlemen, I submit to you in view of McFarland's testimony and what was going on in this case at that time, supports the finding by you that no way we can meant simply that ATF was knocking on the door, the police were looking at them, Mrs. Gadget, Kimberly Clifton, is down in Fort Bragg, how are we going to do anything about silencing her that way. The case against [Saulnier] can be summarized with one question. If [Saulnier] was not involved in a conspiracy to kill Pagans, why was he entertaining the thought of silencing Mrs. Gadget to shut Gadget up?
 
 
 59
 J.A. 340-41. The government argued that Saulnier was engaged in a conspiracy to kill or intimidate Kimberly Clifton, which proved that he was involved in the Sec. 1959 conspiracy charged in the indictment. Saulnier, however, had previously been acquitted of conspiring to harm Kimberly Clifton. The fact of his participation in that conspiracy was actually and necessarily determined in the first trial. The government had a full and fair opportunity to litigate the issue in the first trial and the issue was decided against it. The government was collaterally estopped from introducing evidence at the second trial to prove Saulnier's participation in a conspiracy to silence Kimberly Clifton. We reverse Saulnier's conviction and remand his case for a new trial at which evidence of this conversation with McFarland should be excluded.
 
 VI.
 
 60
 The defendants argue that the district court erred in failing to find prosecutorial vindictiveness on the basis of the Third Superseding Indictment. The court's finding regarding prosecutorial vindictiveness is reviewed for abuse of discretion. United States v. Greenwood, 796 F.2d 49, 52 (4th Cir.1986) (in the context of selective prosecution).
 
 
 61
 A defendant may not be punished for exercising a protected statutory or constitutional right. United States v. Goodwin, 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982). In certain cases where detrimental action was taken against the defendant by the government immediately following her exercise of a right, the Court presumes an improper vindictive motive on the part of the prosecutor. Id. at 373, 102 S.Ct. at 2488-89. This presumption arises, however, "only in cases in which a reasonable likelihood of vindictiveness exists." Id. Where the presumption arises, it may be rebutted by objective information justifying the detrimental action. Id. at 374, 102 S.Ct. at 2489.
 
 
 62
 The presumption generally arises where the defendant is reindicted after she exercises her legal right to a trial de novo or following her successful post-conviction appeal. United States v. Whaley, 830 F.2d 1469, 1477 (7th Cir 1987), cert. denied, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988). "Courts have consistently held that no realistic likelihood of vindictiveness is found when a jury is deadlocked and both parties agree that a declaration of mistrial is a necessity." Id. at 1478-79. "Absent evidence of actual retaliation, mere reindictment after a mistrial due to a hung jury is insufficient to demonstrate the realistic likelihood of prosecutorial vindictiveness...." Id. (quoting United States v. Ruppel, 666 F.2d 261, 267 (5th Cir.), cert. denied, 458 U.S. 1107, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982)).
 
 
 63
 In the first trial, the jury was unable to reach a verdict on Count 1 as to all defendants and on Count 5 as to O'Bier. The district court sua sponte, without objection and by necessity, declared a mistrial on these counts. The government subsequently reindicted defendants on these charges and added two new charges, evidence of which it had obtained just two weeks prior to the first trial. Rather than seek a new indictment for the manufacture of a dangerous weapon at that time, the government decided to proceed to trial with the indictment as it stood. Where the change in the indictment is prompted "by newly discovered evidence supporting the imposition of additional counts ... a presumption of vindictiveness is not warranted." United States v. Bryant, 770 F.2d 1283, 1287 (5th Cir.1985), cert. denied, 475 U.S. 1030, 106 S.Ct. 1235, 89 L.Ed.2d 343 (1986). Neither have the defendants presented any evidence of actual vindictiveness. The district court correctly denied defendants' motion for dismissal on this ground.
 
 VII.
 
 64
 For the reasons set forth above, we affirm the convictions of Ronald Fiel, John Lea and Michael O'Bier. We reverse Todd Saulnier's conviction and remand for a new trial in accordance with this opinion.
 
 
 65
 AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.