**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4123

UNITED STATES OF AMERICA,

       Plaintiff – Appellee

v.

WILLIAM R. WHYTE,

       Defendant – Appellant,

and

ARMET ARMORED VEHICLES, INC.,

       Defendant.

Appeal from the United States District Court for the Western District of Virginia, at Danville. Jackson L. Kiser, Senior District Judge. (4:12-cr-00021-JLK-2)

Argued: December 12, 2018            Decided: March 12, 2019

Before AGEE, DIAZ, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Diaz and Judge Harris joined.

**ARGUED:** Monica Taylor Monday, GENTRY LOCKE, Roanoke, Virginia, for Appellant. Jeffrey M. Smith, UNITED STATES DEPARTMENT OF JUSTICE,

Washington, D.C., for Appellee. **ON BRIEF:** Justin M. Lugar, GENTRY LOCKE, Roanoke, Virginia, for Appellant. Brian A. Benczkowski, Assistant Attorney General, Matthew S. Miner, Deputy Assistant Attorney General, Caitlin R. Cottingham, Trial Attorney, Fraud Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Thomas T. Cullen, United States Attorney, Roanoke, Virginia, Heather L. Carlton, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.

AGEE, Circuit Judge:

A jury in the Western District of Virginia convicted William R. Whyte of three counts of major fraud against the United States, in violation of 18 U.S.C. § 1031; three counts of wire fraud, in violation of 18 U.S.C. § 1343; and three counts of presentation of false or fraudulent claims, in violation of 18 U.S.C. § 287. Asserting various errors by the district court, Whyte asks this Court to reverse his convictions.[1] For the reasons that follow, we affirm the judgment of the district court.

I.

This case involves parallel False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and criminal proceedings stemming from Whyte's failure to provide multinational forces in Iraq with contracted-for armored vehicles. In December 2005, a U.S. Army officer—who was in Iraq as part of the Joint Contracting Command–Iraq (the "JCC-I")[2]—undertook the acquisition of armored vehicles that would be suitable for transporting senior Iraqi officials. Armet Armored Vehicles, Inc. ("Armet"), an American company

---

[1] Whyte does not challenge the sentence imposed by the district court.

[2] The JCC-I was a temporary organization—created within and jointly run by various branches of the Department of Defense (the "DOD"), including the Army, Navy, Air Force, and Marine Corps—that procured contracts for supplies and services in Iraq. The JCC-I operated on behalf of the Multinational Security Transition Command–Iraq (the "MNSTC-I"), a military command created by the DOD and responsible for training and equipping Iraqi security and police forces. In turn, the MNSTC-I fell under the direction of the Multinational Force–Iraq (the "MNF-I"), the coalition force authorized by the United Nations Security Council that oversaw, "under United States command and control," military operations in Iraq. *See Laudes Corp. v. United States*, 86 Fed. Cl. 152, 155 (2009) (recounting the creation of the MNSTC-I and JCC-I as the result of National Security Policy Directive 36, issued by President George W. Bush in May 2004).

3

owned and run by Whyte,[3] received a contract in April 2006 to provide twenty-four armored vehicles to the JCC-I in exchange for approximately $4.8 million. Armet President Skinner and U.S. Air Force Master Sergeant Michael Hollon—as "contracting officer" on behalf of the U.S.—signed the contract, J.A. 3263, which stated that it was issued by the JCC-I and that payment would be made by the U.S. Army Corps of Engineers (the "USACE") Finance Center.

The contract further specified a delivery timeline: four vehicles were to be delivered within forty-five days of the award and the remaining twenty no later than July 31, 2006. In June 2006, the JCC-I awarded Armet a second contract for eight more armored vehicles, at the cost of approximately $1.6 million. These additional vehicles were to be delivered no later than ninety days from the second award date. Altogether, Armet was to provide thirty-two vehicles with the last set to be delivered by mid-September 2006.

Less than a month after the first contract had been signed, Armet began requesting progress payments. The JCC-I initially denied these requests as contrary to the terms of the contract, which specified payment upon delivery. Nonetheless, following the delivery

---

[3] Armet had production facilities in Virginia and Florida. Whyte—a dual citizen of the United Kingdom and Canada—resided in Canada and oversaw a related Canadian company called Armet Armored Vehicles Canada, Inc. While Whyte managed much of the production that occurred in Canada, Armet President Frank Skinner oversaw U.S. operations.

Armet was charged in the July 2012 Indictment of the same major fraud, wire fraud, and false claims counts as Whyte, but was later dismissed as a defendant. Accordingly, it is not a party to this appeal.

4

of the first four vehicles in August and October 2006,[4] Armet continued requesting such payments, noting at one point that a cash infusion was necessary for Armet to complete the remaining twenty-eight vehicles. Armet also sent emails stating it had "alternative business decisions to consider" if it did not receive such payments. J.A. 3415, 3417. In December 2006, the JCC-I issued a progress payment to Armet of $824,531.

Despite the payment, Armet delivered only two of the remaining twenty-eight vehicles over the next year. Instead, Whyte—while continuing to provide estimated delivery schedules to the JCC-I—directed Armet to prioritize other, higher-paying contracts. By March 2008, the JCC-I had terminated its contracts with Armet. As of that date, Armet had delivered six of the thirty-two vehicles and had been paid $2 million in delivery and progress payments.

Meanwhile, the DOD and the Federal Bureau of Investigation (the "FBI") had learned that Armet's vehicles were potentially deficient and did not meet the contract specifications. Toward the end of 2006, Skinner had become a confidential informant for the FBI in relation to a separate national security investigation. Through him, the FBI had discovered armoring and ballistic weaknesses in the vehicles. The FBI informed the DOD of the defects. In response, the DOD began pulling the vehicles from the field. Ballistics and explosives testing by the FBI in 2008 confirmed significant deficiencies in the Armet vehicles. For example, at least three test shots "penetrated or perforated the roof of the [vehicle]." J.A. 1250. A test explosion punctured parts of the vehicle that held motor oil

---

[4] After each of these deliveries, the USACE wired Armet $398,307.80 in payment under the contract.

and transmission fluid, as well as three of four tires, and also caused pieces of metal to enter the interior of the vehicle. And every test shot penetrated the gunner turret, which was fabricated with only one sheet of steel despite a contract specification of two.

In July 2012, a federal grand jury in the Western District of Virginia indicted Whyte on twelve counts of major fraud against the U.S., wire fraud, and presentation of false claims.[5] The Government[6] requested Whyte's extradition from Canada, which Whyte opposed.

In October 2012, Skinner filed a separate FCA civil suit in the Western District of Virginia as relator against Whyte and Armet. *See United States ex rel. Skinner v. Armet Armored Vehicles, Inc.*, No. 4:12cv00045, 2015 WL 6446226 (W.D. Va. Oct. 16, 2012). The Government opted not to intervene, and the case went to trial in June 2015. Skinner's case-in-chief included his own testimony, a videotaped deposition of Whyte, and deposition testimony from a former Armet consultant. The jury returned a verdict in favor

---

[5] Counts One through Three charged Whyte with major fraud against the U.S., in violation of 18 U.S.C. § 1031, alleging that Whyte enriched himself by (1) requesting and receiving payment for the deficiently-armored vehicles and (2) receiving progress payments, which were then diverted to expenses that did not involve the completion of the vehicles. Counts Four through Nine charged Whyte with wire fraud, in violation of 18 U.S.C. § 1343, for the fraudulent representations regarding the progress of the vehicles. Counts Ten through Twelve charged Whyte with false, fictitious, and fraudulent claims, in violation of 18 U.S.C. § 287, for the delivery and progress payments. The Government eventually dismissed three of the wire fraud counts (Counts Four, Five, and Nine).

[6] Throughout this opinion, "the Government" refers to both (1) the United States government in relation to its prosecution of Whyte and in its capacity to become a party to an FCA suit as well as (2) the United States or one of its agencies in their capacity to receive claims for payment, as required by the essential elements of the major fraud and false claims charges. *See* 18 U.S.C. §§ 287, 1031.

of Armet and Whyte, finding Whyte had not presented fraudulent claims for payment for the vehicles.

Whyte was eventually extradited from Canada to the U.S. in September 2016. He then sought to dismiss the Indictment, contending any criminal proceeding was collaterally estopped by the FCA action. The district court rejected this argument, concluding the Government was not precluded from filing the Indictment because it could not have been a party to an FCA suit in which it had not intervened: "The [G]overnment is not bound by the findings of a jury in which the [G]overnment was only a party in interest with no authority to participate in the action." *United States v. Whyte*, 229 F. Supp. 3d 484, 491 (W.D. Va. 2017).[7]

Later, Whyte filed a second motion to dismiss the Indictment on the grounds that the Government could not prove the legal elements of the major fraud and false claims charges, which require that the Government or one of its agencies be the victim of the fraud. Whyte argued that even if he had engaged in the charged conduct, neither the Government nor one of its agencies had been defrauded because Armet had contracted with the JCC-I—which fell under the multinational MNF-I—and not a Government agency. The district court also denied this motion, concluding that payment of Government funds was sufficient to establish the Government as a party to the contract for the purposes of the major fraud and false claims charges.

---

[7] We have omitted any internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

7

Following a September 2017 trial, the jury convicted Whyte on all nine counts. The district court sentenced Whyte to seventy months' imprisonment on the major fraud and wire fraud counts and sixty months' imprisonment on the false claims counts, to be served concurrently.

Whyte now appeals and seeks reversal of his convictions on three grounds. Ground One contends that the district court erroneously concluded that the Government was not precluded from prosecuting Whyte for the same conduct as alleged and adjudicated in the FCA action. Ground Two asserts that the Government could not prove the elements of the fraud counts because a Government agency was not a party to the contract. And Ground Three contends that the district court deprived Whyte of his due process right to a fair trial because of allegedly improper comments by the Government. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We first consider whether Whyte's criminal prosecution was collaterally estopped by the prior FCA action.[8] This Court reviews "de novo a district court's refusal to dismiss

---

[8] This is not the first time Whyte has presented this issue to this Court: he previously filed an interlocutory appeal contesting the district court's pretrial order rejecting his collateral estoppel claim. This Court held that it lacked jurisdiction over that interlocutory appeal because collateral estoppel "is a defense to criminal liability, and thus is ineligible for immediate review." *United States v. Whyte*, 691 F. App'x 108, 108 (4th Cir. 2017) (per curiam).

We further concluded that Whyte's appeal also could not be construed as a claim of double jeopardy. "Although Whyte attempt[ed] to shoehorn his [collateral estoppel] claim[]" into the rule that permits "interlocutory appeals of pretrial orders rejecting (Continued)

an indictment assertedly barred by collateral estoppel." *United States v. Ruhbayan*, 325 F.3d 197, 201 (4th Cir. 2003). The district court's factual findings made "in connection with such a ruling are reviewed for clear error." *Id.*

A.

1.

The following elements determine whether collateral estoppel bars a criminal prosecution: (1) whether the issue in question is identical to the issue adjudicated in the prior proceeding; whether the issue was (2) actually and (3) necessarily determined in the prior adjudication; (4) "whether the resulting judgment settling the issue was final and valid[;] and (5) whether the parties had a full and fair opportunity to litigate the issue in the prior proceeding." *United States v. Fiel*, 35 F.3d 997, 1006 (4th Cir. 1994). In order for a prosecution to be barred under *Fiel*, "each of the[] five elements must be resolved in the movant's favor." *Ruhbayan*, 325 F.3d at 202.

While there is some dispute among the parties as to the resolution of the first four factors, we can resolve this case by discussing only the fifth factor: did the Government have a full and fair opportunity to litigate the issue in the prior proceeding? Although this factor would typically be resolved by determining whether the Government was a party to the prior proceeding, our analysis is complicated under the FCA by the Government's party status to an FCA action in which it did not intervene. Therefore, our resolution of

---

claims of former jeopardy, Whyte never faced a prior prosecution for the charges he [sought] to preclude." *Id.* Therefore, Whyte could not "colorably claim to suffer double jeopardy." *Id.*

9

this issue depends on what impact, if any, the Government declining to intervene in an FCA action has on determining whether the Government was a party to the prior FCA action. Whyte argues that because (1) a relator brings each FCA action on behalf of the Government and (2) the FCA accords a number of unique statutory powers to the Government, the Government is necessarily a party to every FCA case. The Government contends that it cannot be considered a party—with a full and fair opportunity to litigate—to an FCA action in which it did not intervene. Our review of the language and structure of the FCA compels the conclusion that for the purposes of an inquiry under *Fiel*, the Government is not a party to an FCA action in which it has declined to intervene.

2.

The FCA imposes civil liability upon any person who "knowingly presents, or causes to be presented" to the Government "a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). An FCA action may be brought either directly by the Government or by a private relator via a *qui tam* proceeding. *Id.* § 3730(a), (b). When a relator brings an FCA action, the complaint remains under seal for at least sixty days. *Id.* § 3730(b)(2). During this time, only the Government is served a copy of the complaint and supporting evidence. *Id*. Within sixty days after receiving these materials, the Government may elect to intervene. *Id.* § 3730(b)(4). If it does so, "the action shall be conducted by the Government," *id.* § 3730(b)(4)(A), meaning that the Government takes on "the primary responsibility for prosecuting the action, and shall not be bound" by any

10

act of the relator, though the relator may continue as a party to the proceeding. *Id.* § 3730(c).

By contrast, if the Government declines to intervene, the relator has the right to conduct the action. *Id.* § 3730(b)(4)(B). Nonetheless, even when the Government has not intervened, the FCA extends some control over the litigation to the Government that a nonparty would ordinarily not have. For example, the Government maintains the right to settle or dismiss the action at any time, veto a relator's decision to voluntarily dismiss the action, request service of pleadings and deposition transcripts, and seek to stay discovery that would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts. *See id.* § 3730(b), (c). Furthermore, a court may permit the Government to intervene at a later point "upon a showing of good cause." *Id.* § 3730(c).

This statutory framework has led the Supreme Court to recognize that even when the Government declines to intervene, it remains a "real party in interest" to an FCA suit, *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 934 (2009). A "real party in interest" is "entitled under the substantive law to enforce the right sued upon and . . . generally . . . benefits from the action's final outcome." *Id.* at 935 (quoting Black's Law Dictionary); *see also United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017) (recognizing that the Government's "absolute veto authority" over FCA suits is "entirely consistent with the statutory scheme of the FCA," in which the Government remains the real party in interest even when it declines to intervene); *United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961

11

F.2d 46, 50 (4th Cir. 1992) (holding that a state university was not entitled to Eleventh Amendment immunity in an FCA suit brought by a relator because the Government was the real party in interest in the *qui tam* suit despite declining to intervene); *cf. United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1087 (11th Cir. 2018) ("[I]f the [the Government] declines to intervene, the relator may proceed with the action alone on behalf of the government, but the [the Government] is not a party to the action." (citing 31 U.S.C. § 3730(c)(3)).

The collateral estoppel issue under the FCA in the criminal context, as in this case, appears to be an issue of first impression. Nonetheless, the Supreme Court and this Court's consideration of the Government's party status under the FCA is highly instructive. In *Eisenstein*, the Supreme Court analyzed whether, when the Government had declined to intervene in a *qui tam* suit, the statute of limitations to appeal the suit was thirty days (the normal appeal period following entry of judgment) or sixty days (the appeal period applicable when the Government is a party). 556 U.S. at 929. The Supreme Court concluded the statute of limitations was thirty days because the Government was not a party: "[W]hen the [Government] has declined to intervene in a privately initiated FCA action, it is not a party to the litigation for purposes of either [28 U.S.C.] § 2107 or Federal Rule of Appellate Procedure 4." *Id.* at 937.

*Eisenstein* reached this conclusion for several reasons. First, when the Government "declines to intervene, the relator retains the right to conduct the action," 31 U.S.C. § 3730(c)(3), while the Government is limited to exercising only very specific rights, as noted above. These limited and specific rights, which Whyte recites in his arguments,

12

did not confer party status for statute of limitations purposes in *Eisenstein*. 556 U.S. at 932–33.

Second, when the Government declines to intervene, it does not assume the de facto or de jure position of a "party." "A party to litigation is 'one by or against whom a lawsuit is brought.'" *Id.* at 933 (quoting *Party*, Black's Law Dictionary 1154 (10th ed. 2014)). Further, party status may also be established through *intervention*. *Id.* at 933 (noting that Black's Law Dictionary defines "intervention" as "the legal procedure by which a third party is allowed to become a party to the litigation"). Specifically, *Eisenstein* observed that the term "to intervene" as "used in reference to legal proceedings, . . . covers the right of one to interpose in, *or become a party to,* a proceeding already instituted." *Id.*); *see also Marino v. Ortiz,* 484 U.S. 301, 304 (1988) (per curiam) (holding that "when [a] nonparty has an interest that is affected by the trial court's judgment," "the better practice is for such a nonparty to seek intervention for purposes of appeal" because "only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment"). Put simply, under *Eisenstein*, when the Government has not brought or intervened in an FCA action, it is not a "party."

This view is also supported by the FCA's statutory structure. Concluding that the Government is a party to FCA actions in which it has not intervened "would contradict well-established principles of statutory interpretation that require statutes to be construed in a manner that gives effect to all of their provisions." *Eisenstein*, 556 U.S. at 933. These provisions include the Government's limited rights when it declines to intervene and the necessity of intervention for the Government to become a party, all of which would

13

become superfluous if the Government were to automatically become a party upon the filing of a *qui tam* suit by a relator.

Furthermore, Congress gave the Government discretion to intervene—"a decision that requires consideration of the costs and benefits of party status." *Id.* at 933; *see also id.* at 933–34 (citing "Fed. R. Civ. P. 26(a) (requiring a party to disclose certain information without awaiting any discovery request); Rule 34 (imposing obligations on parties served with requests for production of information); Rule 37 (providing for sanctions for noncompliance with certain party obligations)"). A court "cannot disregard that congressional assignment of discretion by designating the [Government] a 'party' even after it has declined to assume the rights and burdens attendant to full party status." *Id.* at 934.

This Court has similarly distinguished the party status of the Government pre- and post-intervention in the context of the FCA's statute of limitations. Section 3731(b) provides that an FCA suit may either be brought (1) six years after the date of the violation; or (2) up to ten years after the date "when facts material to the right of action are known or reasonably should have been known by the official of the [U.S.] charged with responsibility to act[.]" In considering whether the longer limitations period should have applied in an FCA case in which the Government had declined to intervene, this Court held that the latter limitations period only applies "in cases in which the [Government] is a party"—that is, in a case in which it intervenes in or initiates the FCA suit. To hold otherwise would "produce the bizarre scenario in which the limitations period in a relator's action depends on the knowledge of a nonparty to the action." *United*

14

*States ex rel. Sanders v. N. Am. Bus Indus., Inc.*, 546 F.3d 288, 293 (4th Cir. 2008). This is because "once the material facts supporting a right of action are known to the [Government], it is doubtful that the responsible official "could be charged with any responsibility other than to see that the government brings or joins an FCA action within the limitations period." *Id.* at 294. "After all, government officials are certainly not charged with the responsibility to ensure that a relator brings a timely FCA action." *Id.*

Therefore, for statute of limitations purposes, the Supreme Court and this Court have concluded that the Government is not a party to an FCA suit in which it has declined to intervene. For the reasons explained below, this logic applies in the case at bar to resolve the fifth *Fiel* factor.

## B.

We agree with the district court that the Government cannot be considered to have been a party to the FCA suit—with a full and fair opportunity to litigate the matter—for collateral estoppel purposes as it relates to this criminal proceeding. And each argument that Whyte presents to the contrary—that (1) the Government did in fact litigate the FCA action and (2) the FCA's statutory structure supports a finding of party status—has already been considered and rejected by *Eisenstein* and *Sanders*.

First, because the Government did not intervene in the *qui tam* suit, it did not have the opportunity to litigate the matter of Whyte's fraud. Although Whyte argues that the Government's limited involvement in the FCA action, including receipt of pleadings and depositions as well as monitoring of discovery, demonstrates that the Government did participate in the litigation, the reasoning of *Eisenstein* and *Sanders* controls. The

15

Government's party status when it is actively litigating the FCA action after intervention is distinguishable from the Government's interest in the action when it is not participating. Even if the Government remains the real party in interest to a *qui tam* suit in which it has not intervened, "party in interest" is a "term of art" that "does not automatically convert [the Government] into" an "actual party" to the case. *Eisenstein*, 556 U.S. at 934, 35. And 31 U.S.C. § 3730(c)(3) supports this reading: "If the Government elects not to proceed with the action, *the person who initiated the action . . . conduct[s] the action*," even though the Government may request copies of certain documents. (Emphasis added.)

Thus, when the Government does not intervene, it is not "conduct[ing] the action." *See* 31 U.S.C. § 3730(c)(3). As a nonparty in Skinner's FCA action, the Government exercised no control over the evidence, examination of witnesses, briefing of legal arguments, or wording of jury instructions—all hallmarks of litigation strategy, which remained with the relator. Furthermore, the choice of evidence, witnesses, and briefing would have been different, given the differing criminal and civil postures of the two cases, as well as access to and development of evidence. *Cf. United States v. Hickey*, 367 F.3d 888, 893 (9th Cir. 2004) ("[T]he [Securities and Exchange Commission], the adverse party in the first proceeding, and the [Government] are not the same party. The SEC brought its action pursuant to the [Securities and Securities Exchange Acts]. It was not acting as the federal sovereign vindicating the criminal law of the United States."); *Ruhbayan*, 325 F.3d at 204 (noting, in the context of collateral estoppel as between two criminal trials, that "if the second trial, involving an already litigated issue, will be

16

substantially more than a mere rehash—because of evidence unavailable and undiscoverable prior to the earlier trial—the Government has not been afforded a full and fair opportunity to litigate the issue").[9]

Second, the FCA's statutory scheme supports this conclusion. Finding the Government an actual party in this situation would, as *Eisenstein* noted, "render the intervention provisions of the FCA superfluous, as there would be no reason for the [Government] to intervene in an action in which it is already a party." 556 U.S. at 933.

Whyte attempts to argue that such an interpretation would produce an asymmetrical result in which the Government could elect not to intervene, observe the evidence presented in an FCA proceeding, and then—should the action not resolve in its favor—have a proverbial second bite at the apple. But this argument does not account for the FCA's purposely asymmetrical structure. As *Eisenstein* noted in dismissing a similar argument, the FCA was designed so that the Government could choose to intervene (that is, expend resources on a case), to control whether a case is dismissed or settled, or to pursue alternate remedies. *Id.* at 933 ("Congress expressly gave the [Government]

---

[9] Whyte alternatively contends that even if the Government cannot be considered a party, the relationship between the government and the relator is analogous to that of assignor and assignee such that the Government should be considered precluded from bringing a later criminal action based on the same conduct.

We disagree. Non-party preclusion based on an assignor-assignee relationship applies only to claims concerning assigned property. *See Taylor v. Sturgell*, 553 U.S. 880, 894 (2008). Furthermore, even if such principles were to apply, an assignee's ability to bind an assignor through preclusion principles can be no broader than the scope of the assignment. But here, the assignment is limited in two ways: (1) the relator only has an interest in a portion of the recovery, and (2) the relator's interest does not extend beyond the Government's claims under the FCA. The Government did not assign to Skinner its interest in the enforcement of criminal laws.

17

discretion to intervene in FCA actions—a decision that requires consideration of the costs and benefits of party status."). Furthermore, the Government's actions in this case arguably did not represent a second bite at the apple: the Indictment was filed months before Skinner's *qui tam* action. Therefore, the Government had already made its choice as to which judicial proceeding it would pursue against Whyte.

Under the framework Whyte endorses, which both the Supreme Court and this Court have previously rejected, and which runs afoul of the language of the statute, the Government would have no real choice as to whether to become a party. Instead, it would be forced to intervene in all FCA suits to prevent being precluded from prosecuting future criminal actions based on the same underlying conduct.[10] This course would contravene the clear Congressional intent to give the Government the discretion to intervene in FCA actions after weighing all of the costs and benefits of intervention. *See id.* at 934 ("The Court cannot disregard that congressional assignment of discretion by designating the

---

[10] We do not quarrel with Whyte's contention that the FCA creates a substantive legal relationship where the relator "is essentially a self-appointed private attorney general," representing the interests of the Government and prosecuting on its behalf. *Milam*, 961 F.2d at 49. Nor do we (for purposes of this case) need to take issue with those courts holding that the Government may be bound (for some purposes) by an FCA action in which it did not intervene. *See, e.g.*, *United States ex rel. Vaughn v. United Biologics, L.L.C.*, 907 F.3d 187, 193 (5th Cir. 2018); *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009); *Stoner v. Santa Clara Cty. Office of Educ.*, 502 F.3d 1116, 1126–27 (9th Cir. 2007).

But this appeal involves an ingredient not present in those cases: "the important federal interest in the enforcement of criminal law." *Standefer v. United States*, 447 U.S. 10, 24 (1980). And even if we accept that the outcome of a civil case in which the Government is a party may have preclusive force in a later criminal prosecution*, see, e.g*, *United States v. Egan Marine Corp.*, 843 F.3d 674, 677 (7th Cir. 2016), it is a bridge too far to say that the litigation choices of a relator bind the Government in the same way.

18

[Government] a 'party' even after it has declined to assume the rights and burdens attendant to full party status."). Accordingly, we conclude that when determining whether the Government's criminal prosecution of a defendant has been collaterally estopped by a prior FCA action concerning the same issues in which the Government did not intervene, the Government cannot be considered to have been a party with a full and fair opportunity to litigate.

\* \* \* \*

Because Whyte has failed to demonstrate that all five *Fiel* factors must be resolved in his favor, Whyte's criminal prosecution was not estopped by the prior FCA action. We affirm the district court's denial of the motion to dismiss the Indictment on this basis.

III.

We next consider whether, even if Whyte engaged in the alleged fraud, the Government was not defrauded—as required by the major fraud and false claims charges[11]—because Armet's contract was ultimately with the multilateral MNF-I rather than the Government.

Whyte presented this challenge both in a motion to dismiss the Indictment and a post-trial motion challenging the sufficiency of the evidence. A challenge to an indictment is reviewed de novo. *United States v. Vinyard*, 266 F.3d 320, 324 (4th Cir.

---

[11] Parties dispute whether the essential elements of the wire fraud charges include defrauding the Government. For the reasons set forth below, we need not resolve this question.

19

2001). "An indictment is sufficient if it states each of the essential elements of the offense." *United States v. Lockhart*, 382 F.3d 447, 449 (4th Cir. 2004).

In turn, a challenge to the sufficiency of the evidence is also reviewed de novo. *See United States v. Howard*, 773 F.3d 519, 525 (4th Cir. 2014). "In its assessment of a challenge to the sufficiency of evidence, a reviewing court views the evidence in the light most favorable to the prosecution and decides whether substantial evidence supports the verdict." *Id.* "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* This Court will affirm the verdict "if *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Barefoot*, 754 F.3d 226, 233 (4th Cir. 2014).

Upon review, we conclude that the Indictment properly charged the essential elements of the offense and that the evidence was sufficient to support the convictions.

A.

The central element that the parties dispute is whether the Government or one of its agencies was the defrauded party. 18 U.S.C. §§ 287,[12] 1031.[13] Eighteen U.S.C. § 6

---

[12] To prove false claims under 18 U.S.C. § 287, the Government must show: (1) the defendant knowingly made or presented a claim to any federal agency and (2) the defendant knew that such claim was false, fictitious, or fraudulent. *United States v. Ewing*, 957 F.2d 115, 119 (4th Cir. 1992).

[13] To prove major fraud under 18 U.S.C. § 1031, the Government must show: (1) the defendant knowingly and with the intent to defraud the Government or to obtain money or property by means of materially false or fraudulent pretenses, representations, or promises; (2) executed or attempted to execute a scheme with the intent to defraud the Government; (3) the scheme took place as a part of acquiring services as a contractor (Continued)

20

defines "agency" as "any department, independent establishment, commission, administration, authority, board or bureau of the [Government] or any corporation in which the [Government] has a proprietary interest, unless context shows that such term was intended to be used in a more limited sense."[14]

B.

1.

We conclude that the Indictment properly alleged that the Government—specifically, the DOD—was the defrauded party. When determining the sufficiency of the Indictment, this Court does not second guess the factual allegations but accepts them as true. *United States v. Mills*, 995 F.2d 480, 487 (4th Cir. 1993).

Here, the Indictment alleged that after the U.S. military entered Iraq in 2003, "the Department of Defense conducted most of its contracting for that operation through the United States Joint Contracting Command in Baghdad, Iraq[.]" J.A. 26. The Indictment further provided that Armet and Whyte "devised a scheme and artifice to defraud the United States . . . as a prime contractor with the United States," J.A. 32, and that Armet and Whyte "made and presented" three specified "claims upon and against the United States Department of Defense," J.A. 36–37. Accordingly, the Indictment properly alleged

---

with the Government on a prime contract with the Government; and (4) the value of the contract was $1,000,000 or more.

[14] 18 U.S.C. § 6 also defines "department" to be "one of the executive departments enumerated in section 1 of Title 5, unless the context shows that such term was intended to be used to describe the executive, legislative, or judicial branches of the government."

21

that the Government—through one of its agencies, the DOD—was the contracting party. And because the Indictment supplied the legally required elements, it was sufficient.

2.

In turn, the evidence at trial was sufficient to establish the status of the Government under the contract because Armet contracted with and defrauded the DOD. First, the contract was signed by Skinner, acting on behalf of Armet, and Sergeant Hollon, as the "contracting officer" on behalf of "the United States." J.A. 3263. The plain language of the contract thus provides that the Government was the contracting party.

Second, even if the contract were ambiguous, testimony from Government witnesses established that the JCC-I derived its contracting authority from the DOD. U.S. military personnel testified at trial that they had worked in and contracted on behalf of the JCC-I in the course of their official DOD duties. *See* J.A. 896-97 (testimony that the JCC-I was jointly run by and for the "Army, Navy, Air Force, [and] Marines," all branches of the DOD); J.A. 1203 (testimony that JCC-I personnel understood their "contracting warrant [to be] a United States of America contracting warrant"); *see also Laudes Corp.*, 86 Fed. Cl. at 155 (explaining that the JCC-I's predecessor, the Iraq Project and Contracting Office, was created as a temporary organization within the DOD).[15]

---

[15] Although the MNF–I and MNSTC–I were multinational organizations, they operated under U.S. control and command. The MNSTC–I was created by National Security Policy Directive 36, the same Directive that established the Project and Contracting Office, while the MNF–I was created as part of an agreement between the U.S., Iraq, and the United Nations. *See Laudes Corp.*, 86 Fed. Cl. at 155.

22

In addition, the evidence at trial established that the JCC-I's financing for the vehicles came from DOD funds: the payments were provided by the Iraqi Security Forces Fund, a Congressional appropriation that made $5.7 billion "available to *the Secretary of Defense . . .* for the purpose of allowing" MNSTC-I to provide assistance and supplies for training Iraqi forces. Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, Pub. L. No. 109–13, 119 Stat. 231, 236 (2005) (emphasis added). These funds were specifically designated to the DOD and facilitated by the USACE. And as DOD Criminal Investigative Service Special Agent John Schoeneweis testified, various features of the payment forms for Armet's contracts indicated that the funds being disbursed were from the "Iraqi Security Forces Fund," which, as just noted, contained only Government funds. J.A. 1989–95, 1998. Altogether, both the plain language of the contract and the evidence presented at trial was sufficient to establish the Government as a party to the contract and the party to whom Whyte presented fraudulent claims.[16]

\* \* \* \*

---

[16] This conclusion is bolstered by decisions from the Court of Federal Claims, which has assumed jurisdiction over certain contract claims against the Government. *See* 28 U.S.C. § 1491(b)(1); 41 U.S.C. §§ 7101–7019. That Court has heard numerous claims against the JCC-I, which have arisen in the context of bid protests and Government contract disputes. In each of these cases, the Court of Federal Claims has recognized the JCC-I as a Government agency. *See, e.g.*, *Oasis Int'l Waters, Inc. v. United States*, 134 Fed. Cl. 405 (2016); *Fulcra Worldwide, LLC v. United States*, 97 Fed. Cl. 523 (2011); *Laudes Corp.* 86 Fed. Cl. at 155; *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518 (2007).

23

For these reasons, we conclude that the Government was a party to the contract with Armet and that the Government both sufficiently alleged such party status in the Indictment and provided sufficient evidence at trial to establish this element of the charged crimes. We therefore affirm the decision of the district court in both respects.

## IV.

### A.

Finally, Whyte argues that the Government denied him a fair trial by making improper comments throughout the course of the proceedings and that the district court erred in denying his motion for a new trial. A district court's denial of a motion for a new trial is reviewed for abuse of discretion. *United States v. Wolf*, 860 F.3d 175, 189 (4th Cir. 2017). The district court's factual findings are reviewed for clear error and its legal determinations de novo. *United States v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997). In turn, this Court reviews a claim of prosecutorial misconduct "to determine whether the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Scheetz*, 293 F.3d 175, 185 (4th Cir. 2002).

### B.

Whyte argues that the Government engaged in improper conduct by making comments suggesting (1) the burden of proof was on Whyte and (2) that defense counsel was attempting to mislead the jury while cross-examining Government witnesses. But the district court properly exercised its discretion in denying Whyte's motion for a new trial. First, the allegedly burden-shifting comments cannot reasonably be construed as such.

24

For example, on cross examination, defense counsel asked Special Agent Schoeneweis about the details of Skinner's deposition testimony in the FCA action, to which the Government objected. The Government contended that Whyte should instead call Skinner as a witness. *See, e.g.*, J.A. 2043 ("If he wants Frank Skinner['s testimony], he can call Frank Skinner."). Defense counsel in turn objected to the Government's comments, arguing the Government's comments implied Whyte carried the burden of proof.

We disagree with Whyte. The Government's objections do not suggest any change in the burden of proof; rather, the Government was clarifying that the way to introduce testimony from Skinner was to call him as a defense witness, rather than through another witness's testimony. Furthermore, the statements were limited and the district court gave a curative instruction. For these reasons, we conclude the comments did not "so infect[] the trial with unfairness," *Scheetz*, 293 F.3d at 185, and that the district court properly concluded a mistrial was not warranted.

Second, Whyte complains of instances in which he asserts the Government improperly suggested that defense counsel was attempting to mislead the jury about the FBI's investigation into Armet. Specifically, the Government objected to cross-examination questions by defense counsel asking Government witnesses if they were aware of the FBI's investigation into Armet at various points, or asking these witnesses if certain information had been considered in determining whether to continue with the

25

contract with Armet.[17] The comments Whyte challenges appear to have been isolated—arising only in the context of the Government's objections to defense counsel's questions—and were not designed to mislead the jury. Furthermore, the district court instructed the jury that the statements by the attorneys were not to be considered as evidence. And finally, there was sufficient evidence separate from the issues related to the Government's comments to support the conviction. Altogether, Whyte does not explain any way in which the challenged statements could have misled the jury or deprived him of a fair trial. For these reasons, we conclude the district court's denial of the motion for a new trial was proper.

## V.

For the reasons set forth above, we affirm the judgment of the district court.

*AFFIRMED*

---

[17] It appears that part of the defense strategy was to present evidence that the JCC-I was unaware of any deficiencies with the vehicles such that it could not present Armet with a cure notice or that the JCC-I continued contracting with Armet despite knowledge of the deficiencies.